## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| Andrew Wesley,<br><br>        Plaintiff,<br><br>v.<br><br>Wexford Health Sources, Inc., Olufunmilola Ayankayo, Marlene Henze, Charles Truitt, Nurse Bruckner, Nurse Mitchell, Nurse Orr, and Nurse Doe #1, Nurse Doe #2, Nurse Doe #3, Nurse Doe #4, Nurse Doe #5, Nurse Doe #6, Nurse Doe #7,<br><br>        Defendants. | Case No.: 23-CV-2849<br><br>Hon. Rebecca R. Pallmeyer<br><br>**JURY TRIAL DEMANDED** |

## FIRST AMENDED COMPLAINT

Plaintiff Andrew Wesley (IDOC No. R-19988) ("Mr. Wesley" or "Plaintiff"), by and through his attorneys, Akerman LLP, respectfully submits this First Amended Complaint against Defendants Wexford Health Sources, Inc., Marlene Henze, Charles Truitt, Olufunmilola Ayankayo, Nurse Bruckner, Nurse Mitchell, and Defendant Doe Nurses #1-7 (collectively, "Defendants"), and alleges in support as follows:

### PARTIES

1.      Plaintiff Andrew Wesley is a citizen of the United States of America and a resident of Crest Hill, Illinois. Mr. Wesley is currently in custody of the Illinois Department of Corrections ("IDOC") and is held prisoner at the Stateville Correctional Center ("Stateville") in Crest Hill, just north of Joliet. Mr. Wesley has been in IDOC custody since 2005.

2.      Defendant Wexford Health Sources, Inc. ("Wexford") is a corporation formed under the laws of the State of Florida, with its principal place of business at 501 Holiday Drive, Suite 300, Foster Plaza Four, Pittsburgh, Pennsylvania 15220. At all relevant times, Wexford had

a contractual relationship with IDOC, pursuant to which IDOC, an agency of the State of Illinois, delegated to Wexford the IDOC's responsibility for the provision of medical care to prisoners in its custody, including that of Mr. Wesley. Wexford is a state actor under 42 U.S.C. § 1983 on account of its exercise of delegated governmental functions.

3.      Defendant Olufunmilola Ayankoya ("Ayankoya") is and at all relevant times was an Advance Practice Nurse employed by Wexford. At all times relevant to this action, Ayankoya served as a nurse at Stateville. Ayankoya was responsible for Mr. Wesley's medical care as an inmate at Stateville.

4.      Defendant Nurse Bruckner ("Bruckner") is and at all relevant times was an Advance Practice Nurse employed by Wexford. At all times relevant to this action, Bruckner served as nurse at Stateville. Bruckner was responsible for Mr. Wesley's medical care as an inmate at Stateville.

5.      Defendant Marlene Henze ("Henze") is and at all relevant times was a medical doctor employed by Wexford. At all times relevant to this action, Henze served as the medical director at Stateville and was, upon information and belief, the only medical doctor employed at Stateville during the relevant time period. Henze was responsible for Mr. Wesley's medical care as an inmate at Stateville.

6.      Defendant Nurse Mitchell ("Mitchell") is and at all relevant times was a Registered Nurse employed by Wexford. At all times relevant to this action, Mitchell served as a nurse at Stateville. Mitchell was responsible for Mr. Wesley's medical care as an inmate at Stateville.

7.      Defendant Nurse Orr ("Orr") is and at all relevant times was an Advance Practice Nurse employed by Wexford. At all times relevant to this action, Orr served as a nurse at Stateville. Orr was responsible for Mr. Wesley's medical care as an inmate at Stateville.

8.      Defendant Charles Truitt ("Truitt") is and at all relevant times was the Warden of Stateville, serving as the prison's chief executive officer and manager.  Truitt's managerial responsibilities include supervision, recruitment, and training of prison staff, budget allocation, and promulgating policies and regulations to govern operations at the prison.  Upon information and belief, Truitt's managerial charge extends to Wexford employees providing medical care at Stateville.

9.      Defendants Nurse Doe #1, Nurse Doe #2, Nurse Doe #3, Nurse Doe #4, Nurse Doe #5, Nurse Doe #6, and Nurse Doe #7 (collectively, "Defendant Doe Nurses") are and at all relevant times were nurses employed with Wexford, all of whom served as nurses at Stateville during the time period(s) relevant to this action.  Defendant Doe Nurses were responsible for Mr. Wesley's medical care as an inmate at Stateville.

10.     Defendants Ayankoya, Bruckner, Mitchell, Orr, and Defendant Doe Nurses are collectively referred to herein as the "Defendant Nurses."

11.     Defendants Bruckner, Mitchell, Orr, and Defendant Doe Nurses are currently named in abbreviated or pseudonymized fashion as these Defendants' full names remain unknown or unascertainable to Plaintiff with the records presently available to Plaintiff.

12.     Defendants Ayankoya, Bruckner, Henze, Mitchell, Orr, Truitt, and Defendant Doe Nurses are each sued in their individual capacities.

**JURISDICTION AND VENUE**

13.     Mr. Wesley brings his federal civil rights claims pursuant to 42 U.S.C. § 1983.  The Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. §§ 1331 and 1343(a).

14.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2), as a substantial part of the events or omissions giving rise to Mr. Wesley's claims occurred in the Northern District of Illinois.

## FACTUAL ALLEGATIONS

15.     Mr. Wesley suffers from sarcoma – specifically, undifferentiated pleomorphic sarcoma ("UPS") – an aggressive form of cancer that develops in body's soft tissues including fat, muscles, and other tissue that connect, support, or surround the body's bones and organs.  The prototypical symptoms of sarcoma include growing, swollen areas or lump-like masses (*i.e.*, tumors) manifested in the legs, arms, or abdomen.  Sarcomas tend to grow quickly, causing these tumors to increase in size and the underlying cancer to spread in a matter of mere weeks to months.  Larger tumors can cause pain and soreness by pressing on the host victim's surrounding nerves, which pain can increase as the tumor grows and cancer spreads into nearby tissues and organs.  The appearance of these tumors requires urgent and fulsome medical evaluation, and time is of the essence in obtaining a diagnosis and responsive treatment.

16.     Unfortunately, despite clear warning signs, including his repeated identification of his symptoms and requests for treatment, Mr. Wesley's sarcoma was left to spread unchecked for months, and was only belatedly diagnosed at Stage III, risking complete metastasis.  Mr. Wesley has and is currently undergoing emergent remedial treatment in response to this diagnosis, including extensive radiation therapy and major surgery to excise the cancerous tissue.

17.     Critically, Mr. Wesley's cancer could and should have been diagnosed, and responsive treatment commenced, long before it advanced to this late stage.  Mr. Wesley presented and advised Defendants of his telltale symptoms of sarcoma, including a conspicuous and growing tumor, severe pain, and a worsening limp, no later than July 18, 2022, and specifically advised

4

Defendants of his concern that the tumor could be cancerous based on familial history. Despite universally recognizing the severity of Mr. Wesley's symptoms and his acute need for specialized diagnostic analysis available only through outside referral, Defendants refused to examine Mr. Wesley's tumor, deferring Mr. Wesley's concerns to ever elusive "follow up" appointments and juggling him through "sick call" visits at Mr. Wesley's cell like a game of "hot potato." Defendants' tortured process delayed effective diagnostic examination of Mr. Wesley's tumor for over *six months*, during which time Mr. Wesley languished in his cell in extreme pain as the sarcoma spread unchecked.

18.     Although Mr. Wesley is finally receiving necessary remedial treatment for his cancer, his future nevertheless remains uncertain, he has not yet been declared cancer-free, and he could have been spared as extensive a surgery were he diagnosed and treated with proper expedience. Certainly, a prompt diagnosis and treatment would have spared Mr. Wesley the many months he spent languishing in agony. Defendants' deliberate indifference to Mr. Wesley's serious medical needs caused these outcomes, engendered and exacerbated by Wexford's dilatory policies and procedures.

## Wexford's Policies and Procedures

19.     On information and belief, Defendant Wexford entered into a ten-year contract with IDOC in 2011, pursuant to which Wexford was obligated to ensure that all medical services provided to IDOC inmates are provided in accordance with the American Correctional Association standards of care. Although the contract expired in 2021, Wexford continues to render medical services on behalf of IDOC and, upon information and belief, the contractual relationship between IDOC and Wexford continues to operate, for all intents and purposes, pursuant the terms of the that agreement. Wexford thus functions as an arm of the State of Illinois, to the extent that it is

delegated with and assumes responsibility for the provision of medical service to prisoners held in state custody.

20.     On information and belief, and in contravention of its charge, Wexford has adopted numerous policies and procedures, embodied in written guidance and/or *de facto* standards of practice, that are designed not to ensure the timely provision of medical care to the incarcerated but rather to reduce or delay the provision of healthcare services to prisoners in an ultimate effort to cut costs.  The "sick call" policy in place at Stateville is one such policy.

21.     On information and belief, "sick call" is a colloquial designation used by Wexford employees (and others) at Stateville that refers to the policy governing Stateville prisoners' submission of requests for medical care and the process by which Wexford employees field those requests.  Generally, sick call functions in two steps: first, a prisoner submits a request to medical or corrections staff on rounds for visitation, usually by placing a written note between the bars of their cell door or by making verbal query; second, medical staff – either paraprofessionals or licensed nurses – respond by visiting the prisoner at their cell door, ostensibly to address the prisoner's concerns or queries.

22.     On information and belief, Wexford employees responding to sick call are required to document facts of the sick call visits, including the prisoner's complaints and symptoms, and to suggest next steps in a treatment plan applicable to the prisoner.  On information and belief, Wexford employees are authorized to refer patient prisoners to see so-called medical "providers" in the Health Care Unit ("HCU") within Stateville when they believe the prisoner's condition requires diagnostic assessment or treatment beyond what is available on sick call.  On information and belief, Wexford employees are further authorized to seek expedited scheduling of such visits where diagnosis or treatment is deemed emergent or time sensitive.  On information and belief,

the sick call system, at least as employed in Stateville, is characterized by chronic backlog and understaffing which tend to cause and exacerbate delays in the provision of responsive treatment.

23.     On information and belief, medical providers at the HCU in Stateville are authorized to refer prisoners to outside, off-site doctors or facilities when prisoners' health needs require greater diagnostic and treatment capabilities than the HCU can provide.  On information and belief, these referral requests must pass through the medical director at Stateville for approval before being forwarded to Wexford corporate for final determination.  Pursuant that procedure, when Wexford facility staff determine that a prisoner needs off-site care, those staff submit a referral request to the medical director in the facility.  If the medical director agrees with the request, the medical director then presents the request to yet other doctors at Wexford's corporate offices in Pittsburgh, Pennsylvania, who either approves or rejects the off-site care request.  On information and belief, this approval process is characterized by chronic backlog and understaffing at the medical director level, which tends to cause and exacerbate delays in the provision of responsive treatment.

24.     On information and belief, Wexford employees are discouraged from escalating treatment plans or referring prisoners to off-site health providers, primarily on the basis that escalating care or referral to such off-site providers is perceived by Defendants to be more "costly" to Wexford and/or IDOC than handling inmates' medical issues "in-house" and/or hoping that prisoner's medical concerns will simply resolve in due course.  On information and belief, the sick call system causes significant gaps in communication between and among Wexford's own facility staff and the medical director, thereby discouraging its employees' exercise of independent medical judgment and handicapping their ability to respond effectively to prisoners' needs.  In doing so, Wexford's policies and practices engender a substandard prison healthcare system rife

7

with delays, diffusion of responsibility, frustration among facility staff who feel powerless to correct or overcome the system, and a lack of consistency in care and oversight that leaves prisoners vulnerable to employees' individual failures and/or exercises of subjective bias.

**Defendants Refuse to Examine Mr. Wesley at his Routine Physical**

25.     Mr. Wesley first experienced conspicuous symptoms of sarcoma in or about July 2022, when he discovered a swollen mass (*i.e.*, tumor) in his left thigh.  The tumor was visible to the naked eye, extremely painful to the touch, and Mr. Wesley could easily feel and palpate it with his fingertips, revealing a distinct mass beneath the skin about the size of a pea.  The tumor caused Mr. Wesley great concern, as he had seen the ravages of cancer touch his family before.  Mr. Wesley kept careful watch over the tumor in the weeks after discovering it, realizing in short order that it appeared to be growing.

26.     On July 18, 2022, Mr. Wesley visited the HCU in Stateville for a routine physical examination.  The physical examination process was familiar to Mr. Wesley, as he had undergone numerous physical exams during his time at Stateville.  On information and belief, IDOC policy requires prisoners be provided comprehensive physical exams upon initial reception and intake screening and at regular intervals during throughout their terms of confinement.  Defendant Ayankoya met with Mr. Wesley in the HCU and stated that she would be conducting his physical. Mr. Wesley introduced himself and sat for the examination.

27.     Ayankoya hurriedly conducted assessments of Mr. Wesley's oral condition (*i.e.*, mouth and throat health) and respiratory function (*i.e.*, regularity and ease of breathing).  Upon concluding these two preliminary tests,  Ayankoya suddenly announced that the physical was complete and asked Mr. Wesley if there was "anything else" he wanted to report.  The conclusion

of the exam surprised Mr. Wesley, who anticipated a more comprehensive examination in line with his past routine physicals at Stateville.

28.　　In response to her query, Mr. Wesley advised Ayankoya of the tumor in his left thigh and the severe pain that it caused him. Mr. Wesley explained that the tumor appeared to be growing, and by now was causing him to walk with a limp, at least on account of the pain. Mr. Wesley further explained his concerns that the tumor could be cancerous and inquired whether Ayankoya could perform an examination. Ayankoya requested Mr. Wesley rate the pain he was experiencing in connection with the tumor "on a scale of '1 to 10,'" to which Mr. Wesley responded that the pain was a consistent "7." Ayankoya further inquired as to whether Mr. Wesley had a familial history of cancer and Mr. Wesley confirmed that he did, explaining that this familial history specifically informed his concerns that the tumor could be cancerous.

29.　　Ayankoya then abruptly inquired whether Mr. Wesley was wearing any "gym shorts" beneath his standard-issued IDOC uniform pants. Mr. Wesley responded that he did not have any gym shorts on beneath his pants but confirmed that he was wearing underwear, and that he would not need to remove his underwear to facilitate examination of the tumor. Ayankoya nevertheless stated that she "could not" examine Mr. Wesley's tumor at that time, but would instead "reschedule" his examination to a future date. Ayankoya advised that the rescheduled examination date would be "far enough" into the future to ensure that Mr. Wesley would have "enough time" to purchase gym shorts beforehand.

30.　　Mr. Wesley implored Ayankoya to examine his tumor, reiterating his concern that the painful mass could be cancerous based both upon his clear physical symptoms and familial history. Mr. Wesley advised Ayankoya that he was amenable to her calling in any additional medical staff and/or IDOC corrections officers as would make her comfortable to perform the

examination, or to otherwise facilitate a hand-off of the examination to other medical staff that same day. Ayankoya refused, insisting that Mr. Westley would instead return at a later date once he had shorts. Ayankoya dismissed Mr. Wesley from the HCU without providing him any pain-relieving medication (*i.e.*, analgesics, or "painkillers"). Ayankoya noted in the appointment record: "Left thigh lesion unable to assess @ at this time. To f/u [follow up] if issue persist. RTC [return to clinic] in 4 wks."

31. Despondent, Mr. Wesley returned to his cell to wait, wondering when he would be able to return to the HCU to have his tumor examined. Racked with pain and memories of loved ones' own past battles with cancer, Mr. Wesley wrote a letter that same day to Defendant Charles Truitt, Warden of Stateville, advising Truitt of Ayankoya's refusal to examine Mr. Wesley's tumor and requesting Truitt's assistance in securing a rapid follow up appointment. Mr. Wesley placed the handwritten letter in the bars of his cell door, where it was eventually picked up by a corrections officer on rounds and, on information and belief, delivered to Truitt. Mr. Wesley never heard anything back from either Ayankoya or Truitt.

**Defendants Delay Diagnosis of Mr. Wesley's Condition for Months on End**

32. The weeks came and went as Mr. Wesley waited to return to the HCU for examination of the tumor. The mass continued to grow rapidly during this time, doubling in size in the first thirty days since Ayankoya refused to examine it. As the tumor grew it became increasingly sensitive to the touch, pressing ever harder on ever more nerves and adjoining tissues and further impacting Mr. Wesley's ability to walk.

33. Alarmed with the conspicuous growth of the tumor and the worsening of his condition, Mr. Wesley repeatedly sought any updates that he could concerning his purportedly rescheduled appointment, inquiring with any staff who happened by his cell, but no one would or

could provide any answers.  Mr. Wesley made numerous sick call requests to staff during this time, hoping to obtain some sort of update or interim care.

34.     On or about August 25, 2022, some thirty eight (38) days after being dismissed from the HCU, Defendant Mitchell made a sick call visit to Mr. Wesley at his cell door.  Mr. Wesley advised Mitchell of his tumor, the promised follow up appointment to the failed July 18, 2022 physical examination, the lack of updates since then, and the rapid growth of the tumor over the interceding six weeks.  Mitchell briefly assessed the tumor before confirming to Mr. Wesley that he would need to see a provider in the HCU for more specialized examination or referral.  Mr. Wesley implored Mitchell for his help in setting the appointment, and Mitchell stated that he would check into Mr. Wesley's appointment status and send a note back by the end of day advising Mr. Wesley of same.  Mitchell spurned Mr. Wesley's requests for painkillers before departing the cell door, and Mr. Wesley heard nothing back from Mitchell concerning the follow up provider visit.

35.     After hearing nothing and continuing to languish in severe pain, Mr. Wesley submitted another request for a sick call.  He was seen again on August 28, 2022, by Defendant Nurse Doe #1 and Nurse Doe #2.  Once again, Mr. Wesley advised Defendants of his tumor, the failed physical examination, the continued growth of the tumor, the constant pain it caused him, and the commensurate progression of his limp.  Defendants briefly examined Mr. Wesley's tumor before advising him that they would need to schedule him to see a provider in the HCU, noting only "mild" symptoms in Mr. Wesley's record, refusing to enter a provider referral themselves, and further noting in the record that Mr. Wesley should only "[r]eturn to see provider if symptoms worsen or interfere with daily functioning."  Mr. Wesley again requested Defendants schedule his previously promised follow up as soon as possible, and again Defendants assured him that they would advise him as to the status of his appointment by the end of the day.  Defendants Nurse Doe

11

#1 and Nurse Doe #2 then provided Mr. Wesley with eighteen (18) 200mg tablets of ibuprofen "for the pain" before departing. Again, Mr. Wesley heard nothing further.

36. On or about September 5, 2022, and again following numerous requests, Mitchell made another sick call visit to Mr. Wesley's cell. Mr. Wesley advised Mitchell that the tumor continued and to cause severe pain, reminded Mitchell of their previous sick call visit two weeks prior and Mitchell's assessment that Mr. Wesley needed to be seen by a provider, informed Mitchell of the same assessment made by Nurse Doe #1 and Nurse Doe #2, and inquired as to when he could be seen by the provider. Mitchell advised Mr. Wesley that "the process is slow" but that he would "eventually be seen." Mitchell again refused Mr. Wesley's requests for pain medication.

37. On September 6, 2022, Mr. Wesley again wrote to Defendant Truitt, advising him of the extended delays he faced in treatment. Mr. Wesley again recounted the delays in treatment in his letter and informed Truitt that the tumor was still growing and still painful to the touch, and again requested Truitt's assistance with looking into the matter and obtaining care. Although the letter was picked up by staff on rounds, and on information and belief was delivered to Truitt, Truitt again did not respond.

38. On September 14, 2022, Mr. Wesley submitted a formal Offender's Grievance complaint to IDOC, recounting his condition, the delays in examination and excruciating pain he suffered, and requesting to be seen by a doctor. Mr. Wesley placed the grievance in the locked grievance submission box on the unit wing, hoping it would be reviewed soon and that *someone* within the administration could expedite his trip back to the HCU. Mr. Wesley heard nothing in response for months.

12

39. On October 15, 2022, almost three months now since the abortive physical, Defendant Nurse Doe #3 visited Mr. Wesley at his cell in response to Mr. Wesley's request for a sick call. Mr. Wesley advised Nurse Doe #3 that the tumor continued to grow, his pain remained severe, and his resulting limp was becoming more pronounced and debilitating. Mr. Wesley implored Nurse Doe #3 to schedule him for or to expedite a provider visit. Similar to Mitchell, Nurse Doe #3 advised Mr. Wesley that "the process" to be seen by a provider is "slow" but that he would be seen "eventually."

40. On or about October 25, 2022, Mr. Wesley was finally returned to the HCU, where he was seen by Defendant Orr. As was now familiar exercise, Mr. Wesley advised Orr of the tumor on his thigh, its rapid and sustained growth, the severity of his pain, the worsening of his limp, and the inexplicable delays in obtaining meaningful examination. Mr. Wesley specifically noted that the tumor, which had been about the size of a pea when first discovered, was now the diameter of a U.S. quarter coin. Orr briefly examined Mr. Wesley's tumor before stating that he would need to receive an ultrasound to ensure proper diagnosis. As no ultrasound equipment is available on the HCU, Orr explained that she would need to submit a request for Mr. Wesley to be taken to an off-site care provider for that procedure. Orr cautioned Mr. Wesley that the ultrasound would take some time, as the request would need to be approved through a "time-consuming" committee process. Mr. Wesley requested Orr provide him pain medication to hold him over in the interim, but Orr refused to provide any and dismissed Mr. Wesley from the HCU.

41. After another ten days of silent suffering waiting in his cell, on or about November 4, 2022, Mr. Wesley was seen by Defendant Bruckner in response to his requests for a sick call. Mr. Wesley advised Brucker of his condition and explained the sequence of events in his treatment (or lack thereof), emphasizing to Bruckner that the pain had not subsided and that the tumor

continued to grow. Bruckner advised Mr. Wesley that he would be scheduled for the ultrasound once approved, but that it "would be a while" before that approval. Mr. Wesley further requested Brucker provide him pain medication to deal with the excruciating pain, but Bruckner refused.

42.     On or about November 22, 2022, about four months since the July 18, 2022 physical, Mr. Wesley was again seen by Defendant Mitchell in response to a sick call request. Mr. Wesley advised Mitchell the tumor had continued to grow, still caused severed pain, and that he had still not been seen by a doctor. Mr. Wesley implored Mitchell to provide him pain medication and requested Mitchell check on or expedite his ultrasound referral or otherwise refer him to a doctor for treatment. Mitchell provided Mr. Wesley an additional eighteen (18) 200mg tablets of ibuprofen, but otherwise advised that "the process is slow" for referrals, that there was "no diagnosis" to follow up on pending the ultrasound, and thus there was "nothing" he could do to help.

43.     On or about November 23, 2022, Defendant Bruckner returned to Mr. Wesley's cell for a sick call. Mr. Wesley advised Bruckner that the tumor continued to grow since their last meeting – now reaching the size of a U.S. half-dollar coin – and that the ibuprofen he received from Mitchell were ineffective to mitigate his pain. Mr. Wesley inquired if Bruckner could provide anything stronger, but Bruckner refused.   Bruckner advised Mr. Wesley that the ultrasound Orr had requested a month prior was finally "approved" but had yet to be scheduled, and that there was "nothing else" she would or could do to assist with his condition or to expedite his treatment.

44.     On or about November 28, 2022, Mr. Wesley again requested a sick call, and was seen by nurse Defendants Nurse Doe #4 and Nurse Doe #5. Again, Mr. Wesley informed the responding nurses of his condition, the four months in delay in examination, the continued growth of the tumor and the severity of his pain. Mr. Wesley further advised Nurse Doe #4 and Nurse

Doe #5 of the insufficiency of the painkillers provided him, and again requested to be seen by a doctor. Defendants provided Mr. Wesley with over-the-counter acetaminophen (rather than ibuprofen) and otherwise advised Mr. Wesley that he would be "notified" once the ultrasound was scheduled.

45. On or about December 1, 2022, Mr. Wesley was again seen by Defendant Bruckner in response to a sick call. Mr. Wesley requested medication for his pain, inquiring if there was anything more effective available than the ibuprofen or acetaminophen tablets he had only been sporadically provided by Mitchell, Nurse Doe #4, and Nurse Doe #5. Bruckner informed Mr. Wesley that she would "not oblige" any of Mr. Wesley's requests for painkillers until "after" he had received the ultrasound that had yet to be scheduled.

46. On December 18, 2022, Mr. Wesley was seen by Nurse Doe #6, in response to a sick call. Mr. Wesley advised Nurse Doe #6 of all the foregoing facts of his treatment and delay and inquired about the status of his ultrasound appointment. Nurse Doe #6 responded that they would follow up with "the scheduler" concerning the ultrasound. On information and belief, the ultrasound had yet to be scheduled by this date. Mr. Wesley heard nothing further from Nurse Doe #6.

**Mr. Wesley's Belated Diagnosis and Treatment**

47. Finally, on December 29, 2022, over five months after requesting examination of the tumor at his physical, and over two months after Orr submitted her request, Mr. Wesley was finally sent off-site from Stateville, to the University of Illinois Chicago ("UIC") Hospital, to receive an ultrasound. Mr. Wesley was attended to and the ultrasound conducted by UIC staff. Mr. Wesley never received advance notice of his ultrasound appointment prior to the day it occurred.

15

48.     At the conclusion of the December 29, 2022 appointment, UIC doctors provided Mr. Wesley – and, on information and belief, Defendant Henze – with result sheets confirming "suspicious abscesses" in Mr. Wesley's left thigh consisting of at least two "nonvascular complex fluid collections." Mr. Wesley was returned to his cell after the ultrasound without being provided any information on next steps.

49.     On or about January 3, 2023, following several restless nights due to continued pain, Defendant Nurse Doe #7 visited Mr. Wesley at his cell door. Mr. Wesley advised Nurse Doe #7 of his condition, his delays in treatment, the recent ultrasound, and persisting pain. Nurse Doe #7 distributed eighteen (18) 200mg tablets of ibuprofen to Mr. Wesley and advised him that he would need to see a provider to discuss his ultrasound results.

50.     Mr. Wesley's condition continued to deteriorate. On or about January 6, 2023, Mr. Wesley was brought to the HCU in a wheelchair to see Defendant Henze. Mr. Wesley advised Henze of the onset of headaches, blurry vision, and a loss of balance that caused him to nearly fall while in the shower. The tumor had grown, by this point, to the size of a fist. Henze briefly discussed the UIC ultrasound results with Mr. Wesley and advised that she would schedule him for "incision and drainage" of the mass in the HCU rather than returning him to the UIC specialists.

51.     A week later, on January 13, 2023, Mr. Wesley was brought back to the HCU. Henze presented Mr. Wesley with an consent form and asked that he execute it so she could "remove" the mass. Mr. Wesley executed the form, and Henze proceeded to make an incision in his left thigh. Ultimately, Henze – who, on information and belief, is neither an oncologist nor a surgeon – attempted to extract the entirety of the mass she could identify within Mr. Wesley's thigh. After digging out what she could, along with some accompanying fatty tissues, Henze sealed the wound. Henze prescribed Mr. Wesley with the analgesic Tramadol, a strong

16

prescription opiate used to treat severe pain and advised Mr. Wesley that he would need to go on "medical lay-in" and cease all work duties or yard time. Henze then dismissed Mr. Wesley from the HCU.

52.     Mr. Wesley returned to his cell following the January 13, 2023 excision. Numerous nursing staff attended to Mr. Wesley to clean and re-dress his wound as the incision began to heal.

53.     The following week, on or about January 17, 2023, Henze submitted the mass she excised from Mr. Wesley to UIC for pathology.

54.     On or about January 20, 2023, UIC doctors issued an initial report to Henze, noting a diagnosis of "pleomorphic malignancy" relating to the sample excised from Mr. Wesley's thigh and counseling additional studies to further characterize the tumor.

55.     Nearly two weeks later, on or about January 31, 2023, Henze again called Wesley to meet with her. Henze summarily informed Mr. Wesley that he had cancer and would be referred to an oncologist at the UIC.

56.     Mr. Wesley continued to suffer pain and dizzy spells over the next weeks, of which he continued to advise medical staff during the routine cleansing and re-dressing of the surgical wound in his thigh.

57.     On or about February 7, 2023, almost six months after submitting it and just days after receiving his cancer diagnosis, Mr. Wesley's grievance to IDOC concerning the delays in his medical treatment and need to see a doctor, submitted September 14, 2022, was returned to him as summarily denied without hearing. Mr. Wesley's administrative remedies have thus been exhausted.

58.     On or about February 9, 2023 – about seven months after Defendant Ayankoya refused to examine him – Mr. Wesley finally met with an off-site oncologist at the UIC, Dr.

Christina Son, to discuss the specifics of his cancer and next steps in his treatment. Dr. Son informed Mr. Wesley of his specific undifferentiated pleomorphic sarcoma diagnosis and advised Mr. Wesley that he would need to undergo further testing, including computerized tomography ("CT") and magnetic resonance imagining ("MRI") examinations, and that she would further refer him to surgical oncology for consult because he had received "an inadequate surgical excision" from Henze and "the original extent of the tumor is unknown." Dr. Son advised Mr. Wesley that she believed his sarcoma had become quite advanced, spreading locally throughout surrounding tissues, and could soon reach metastasis if not treated quickly and aggressively. Dr. Son suggested that, based on a high risk of recurrence, pre- and/or post-op radiation therapy would likely be required. On information and belief, Dr. Son communicated the same report to Henze that same day.

59.     On or about February 14, 2023, Henze received further reports from UIC and met with Mr. Wesley to discuss the results. Henze informed Mr. Wesley that UIC was "moving up" the MRI analysis previously raised by Dr. Son. Henze further stated that Mr. Wesley's cancer was "aggressive" and that he would "be going through a lot" in treatment. Prophetically, Henze noted that Mr. Wesley's treatment was likely to include further and more invasive surgery to remove the cancerous tissue at UIC, conceding her own inability to handle such operations within the HCU.

60.     Ultimately, the oncology doctors at UIC determined that Mr. Wesley would, in fact, need to undergo both radiation therapy and further surgical resection (*i.e.*, the excision of tissue or parts of organs) to treat his sarcoma.

61.     Mr. Wesley began pre-operation radiation therapy at UIC on or about April 5, 2023, which lasted for approximately five (5) weeks. Mr. Wesley soon began to suffer typical symptoms of this therapy, including fatigue, appetite loss, and skin damage.

18

62.     On or about June 16, 2023, nearly an entire year after Mr. Wesley first identified his tumor and Ayankoya refused to examine it, Mr. Wesley finally had surgery at UIC to remove the bulk of the cancerous tissue in his thigh.  In addition to the surgery team extracting the tumor, Mr. Wesley was also treated by a plastic surgeon, who had to perform skin grafts to help replace, protect, or otherwise shield the massive tissue loss Mr. Wesley suffered during the surgery.

63.     Mr. Wesley continues to undergo surgical and oncological follow ups to this day. The result of Mr. Wesley's belated surgery – and the ultimate prognosis of his cancer – remains unclear.  Mr. Wesley's physical condition remains in a weakened state on account of his prolonged suffering, intensive radiation therapy, numerous surgeries, and tissue loss.   The physical and psychological toll wrought upon Mr. Wesley throughout this process is enormous.

**Defendants Were Deliberately Indifferent**

64.     Defendants responded to Mr. Wesley's serious medical condition with deliberate indifference.  Defendants callously disregarded Mr. Wesley's clear signs and symptoms of probable cancer – most specifically, the conspicuous, growing, and painful tumor in his left thigh – which Defendants *knew* they could not adequately examine, diagnose, or treat through either the sick call process or with any of the facilities or functionalities available to them in the HCU. Defendants failed to examine Mr. Wesley when he requested (including at the routine physical examination meant for that purpose), failed to order appropriate diagnostic testing for months, failed to timely approve or expedite that request once made, and failed to provide Mr. Wesley with any medication that could alleviate his suffering, dismissed his cries for help, and inexplicably and inadequately attempted to "remove" Mr. Wesley's tumor in the HCU without appropriate training or equipment, thereby preventing UIC oncologists from being able to assess the tumor in its original form.

65.     The deliberate and callous nature of Defendants' delay in examining and referring Mr. Wesley to the required specialists is highlighted not only by the overall delay in obtaining diagnosis and treatment of Mr. Wesley's sarcoma, but by the specific uncaring acts and utterances of Defendants throughout.  As recounted above, Defendants serially sought to "excuse" their behavior with summary (and substantially false) representations that they were "unable to assess" his tumor and/or that there was "no diagnosis" to follow up on, that they would "not oblige" his requests for help until such diagnoses were obtained, and/or that "nothing that could be done" to secure or expedite appropriate treatment and referrals to obtain that diagnosis.

66.     Mr. Wesley did not receive effective diagnosis and treatment of his sarcoma for almost six months from the date he explicitly raised concerns about and requested Defendants' examination of his malignant tumor.  Defendants' delays in approving Mr. Wesley's referrals or expediting his treatment are attributable to Defendants' deliberate indifference and the natural consequence of Wexford's deleterious policies and procedures.

**Mr. Wesley Has Been Seriously Injured by Defendants' Deliberate Indifference**

67.     Mr. Wesley's Stage III sarcoma could and would have been diagnosed and treated more effectively if Defendants had responded to Mr. Wesley's symptoms with even a modicum of compassion, care, or understanding rather than deliberate indifference.  Defendant Ayankoya clearly suspected Mr. Wesley could be suffering from cancer at the June 18, 2022 physical examination at which she refused to examine him, as evidenced by her pointed queries into Mr. Wesley's familial health history.  Defendant Mitchell and other Defendant Nurses also recognized same, each affirming to Mr. Wesley his need for specialized, off-site diagnostic assessment and remedial treatment unavailable to him at sick call and/or the HCU.  Despite this, Defendant Nurses refused to render or expedite any "referrals" on Mr. Wesley's behalf until at least October 25,

2022.  Defendant Henze failed to promptly make, approve, schedule or expedite Mr. Wesley's referrals to off-site treatment and, further, attempted an unnecessary and decidedly inadequate "removal" of Mr. Wesley's tumor at the HCU, when she was not trained or equipped to do so. And Defendant Truitt, apprised of and knowing the delays and insufficiencies of the medical policies and procedures in place at Stateville, consciously did nothing to intervene or correct his subordinates' miscarriage of duty.

68.     If not for the excessive, six-month delay in obtaining diagnostic testing, Mr. Wesley's aggressive sarcoma would have been diagnosed and treated earlier, rather than being left to spread unchecked.  Defendants' delays afforded the sarcoma more than enough time to avail itself of Mr. Wesley's soft tissues, and Mr. Wesley watched in horror and abject pain as the tumor continued to grow day after day.  Defendants provided Mr. Wesley little more than intermittent handfuls of over-the-counter painkillers and dismissive, insincere lamentations that there was nothing more they could do to help.

69.     In fact, Defendants were eminently capable of and could have addressed Mr. Wesley's serious medical conditions in a variety of alternative and more reasonable ways. Defendants could have examined Mr. Wesley's tumor and submitted a request for diagnostic ultrasound when Mr. Wesley first brought the tumor to Ayankoya's attention during his July 18, 2022 physical examination  in the HCU, but they did not.  Defendant Truitt could have stepped in when Mr. Wesley raised concerns about his tumor and the abortive physical by letter, but he did not.  Defendants could have expedited Mr. Wesley's promised follow up in the HCU, but they did not.  Defendants could have sought to expedite Mr. Wesley's referral for an ultrasound once it was submitted, on the basis of Mr. Wesley's emergent medical condition, but they did not.  Defendants could have referred Mr. Wesley back to UIC oncology when the ultrasound results reported Mr.

21

Wesley's "suspicious abscesses," but they did not, instead opting to attempt follow-up surgery within the confines of a clearly understaffed and underequipped prison. And, at the very least, Defendants could have provided Mr. Wesley with pain medication to help him weather the excruciating pain caused by his sarcoma as he awaited the necessary off-site diagnosis and treatment, but they did not. There is no reasonable explanation to warrant Defendants' cold, callous, and ultimately unconstitutional conduct.

## COUNT I
### Violation of the Eighth Amendment to the U.S. Constitution and 42 U.S.C. § 1983
### (Defendant Nurses)

70. The allegations of paragraphs 1 through 69 are incorporated herein by reference.

71. Defendant(s) Ayankoya, Bruckner, Mitchell, Orr, and Defendant Doe Nurses, while acting under color of state law, performed their duties in a manner that evidenced a deliberate, reckless and/or callous indifference to Mr. Wesley's serious medical need for diagnosis and treatment of his sarcoma, thus depriving Mr. Wesley of his rights protected under the Eighth Amendment of the United States Constitution.

72. Defendant Nurses were deliberately indifferent to Mr. Wesley's serious medical need when they repeatedly failed to examine or treat Mr. Wesley's sarcoma symptoms, delayed in referring Mr. Wesley to an off-site specialist, and further refused to expedite or follow up on any such referrals despite universally recognizing the severity of Mr. Wesley's condition and the lacking diagnostic capabilities available in the HCU.

73. As a direct and proximate cause of Defendant Nurses' conduct, Mr. Wesley suffered undue and exacerbated physical and mental injuries, including months of unnecessarily prolonged pain, mental distress, unchecked spread of the sarcoma, a more serious diagnosis,

increased need for and more intensive remedial treatment once obtained, and diminished life expectancy.

74.     Mr. Wesley is entitled to damages under 42 U.S.C. § 1983 because of these injuries.

**COUNT II**
**Violation of the Eighth Amendment to the U.S. Constitution and 42 U.S.C. § 1983**
**(Henze)**

75.     The allegations of paragraphs 1 through 69 are incorporated herein by reference.

76.     Defendant Henze, while acting under color of state law, performed their duties in a manner that evidenced a deliberate, reckless and/or callous indifference to Mr. Wesley's serious medical need for diagnosis and treatment of his sarcoma, thus depriving Mr. Wesley of his rights protected under the Eighth Amendment of the United States Constitution.

77.     Defendant Henze was deliberately indifferent to Mr. Wesley's serious medical need when she failed to promptly schedule or to expedite Mr. Wesley's referrals to off-site treatment and, further, attempted an unnecessary and decidedly inadequate "removal" of Mr. Wesley's tumor at the HCU, when she was not trained or equipped to do so.  In doing so, Truitt acted with deliberate indifference to both Mr. Wesley's serious medical needs and Defendant Nurses' and Wexford's patent violations of Mr. Wesley's clear constitutional rights to be free from cruel and unusual punishment.

**COUNT III**
**Violation of the Eighth Amendment to the U.S. Constitution and 42 U.S.C. § 1983**
**(Truitt)**

78.     The allegations of paragraphs 1 through 69 are incorporated herein by reference.

79.     Truitt, individually, is and was Warden of Stateville at all relevant times and is vicariously liable for all conduct of, or attributable to, Defendant Nurses as facility staff and Wexford as Stateville's vendor and agent.  On information and belief, Truitt was affirmatively

apprised of, involved in, and was in position to remedy delays in Mr. Wesley's medical treatment, but did not do so. Instead, Truitt failed to adequately supervise Defendant Nurses in performing their duties, failed to inform Defendant Nurses of any capability to expedite Mr. Wesley's treatment that may have existed, failed to make his own referrals when apprised of Mr. Wesley's condition, and otherwise refused to follow up on or expedite referrals in response to Mr. Wesley's complaints. In doing so, Truitt acted with deliberate indifference to both Mr. Wesley's serious medical needs and Defendant Nurses' and Wexford's patent violations of Mr. Wesley's clear constitutional rights to be free from cruel and unusual punishment.

80. As a direct and proximate cause of Truitt's conduct, Mr. Wesley suffered undue and exacerbated physical and mental injuries, including months of unnecessarily prolonged pain, mental distress, unchecked spread of the sarcoma, a more serious diagnosis, increased need for and more intensive remedial treatment once obtained, and diminished life expectancy.

81. Mr. Wesley is entitled to damages under 42 U.S.C. § 1983.

**COUNT IV**
**Violation of the Eighth Amendment to the U.S. Constitution and 42 U.S.C. § 1983**
**(Wexford)**

82. The allegations of paragraphs 1 through 69 are incorporated herein by reference.

83. At all relevant times, Wexford was under contract with the State of Illinois, through IDOC, to provide healthcare to inmates at Stateville, including Mr. Wesley. In this capacity, Wexford acted under color of state law and was responsible for the creation, implementation, oversight and supervision of all policies and procedures followed by Wexford and IDOC employees who serve as medical provides to inmates at Stateville.

84. Wexford maintained policies and procedures at all relevant times that discouraged referral to escalated or off-site medical treatment. Defendant Nurses, Henze, and other Wexford

24

personnel acted pursuant to those policies and procedures when they repeatedly failed to refer Mr. Wesley to an off-site special to examine, diagnose, and treat the conspicuous and painful tumor and delayed approval of the referral once made. These failures amount to deliberate indifference to Mr. Wesley's serious medical needs.

85.     As a direct and proximate cause of Defendant Nurses' conduct, Mr. Wesley suffered undue and exacerbated physical and mental injuries, including months of unnecessarily prolonged pain, mental distress, unchecked spread of the sarcoma, a more serious diagnosis, increased need for and more intensive remedial treatment once obtained, and diminished life expectancy.

86.     Mr. Wesley is entitled to damages under 42 U.S.C. § 1983.

## PRAYER FOR RELIEF

**WHEREFORE**, as a result of the foregoing violations of his constitutional rights, Mr. Wesley requests that the Court grant the following relief against Defendants, jointly, severally, and *in solido*:

87.     Judgment for compensatory damages, in an amount to be determined at trial;

88.     Judgment for punitive damages, in an amount to be determined at trial;

89.     Judgment for nominal damages to vindicate the violation of Mr. Dean's rights under the Constitution of the United States;

90.     An award of reasonable attorneys' fees and costs in bringing this action, in accordance with 42 U.S.C. § 1988; and

91.     Such other and further relief that the Court deems appropriate.

Dated: Chicago, Illinois
      August 17, 2023

                        **AKERMAN LLP**

                        */s/ Brian C. Bianco*
                        Brian C. Bianco
                        71 South Wacker Drive, 47th Floor
                        Chicago, IL 60606
                        Phone: (312) 634-5700
                        Fax: (312) 424-1900
                        Email: brian.bianco@akerman.com

                        Darcy Hansen
                        1251 Avenue of the Americas, 37th Floor
                        New York, NY 10020
                        Phone: (212) 880-3800
                        Fax: (212) 880-8965
                        Email: darcy.hansen@akerman.com

                        *Counsel for Plaintiff Andrew Wesley*