**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **ANDREW WESLEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 23 C 2849** |
| | ) | |
| **WEXFORD HEALTH SOURCES, INC., OLUFUNMILOLA AYANKAYO, MARLENE HENZE, CHARLES TRUITT, HELEN BRUCKNER, NURSE MITCHELL, BRIANNA ORR, and NURSE DOES #1–#5,** | ) | **Judge Rebecca R. Pallmeyer** |
| | ) | |
| **Defendants.** | ) | |

# MEMORANDUM OPINION AND ORDER

In July 2022, Plaintiff Andrew Wesley, an inmate in the Illinois Department of Corrections ("IDOC") at Stateville Correctional Center ("Stateville") complained to medical providers at Stateville about a mass on his left thigh. Beginning in late August 2022, several nurses examined the mass, but Wesley was not seen by a primary care provider—i.e., a nurse practitioner or medical doctor who could escalate his treatment—until October 25, 2022. Upon examination of the mass on that day, Nurse Practitioner Brianna Orr referred Wesley for an ultrasound scan of his leg, the results of which supported suspicion that the mass was an abscess—that is, a pus-filled swelling,[1] a condition from which Wesley had suffered in the past. Dr. Marlene Henze, the Medical Director at Stateville at the time, completed an incision and drainage of the lesion, and sent the solid portion of the mass for biopsy. Biopsy results revealed the mass was in fact more serious—a rare malignant sarcoma. Wesley underwent 25 radiation treatments, followed by surgery to remove the cancerous mass. After surgery, Wesley continues to experience pain while

[1] *See generally Abscess: Types, Symptoms, Causes & Treatment*, Cleveland Clinic (Apr. 30, 2022), https://my.clevelandclinic.org/health/diseases/22876-abscess.

walking, standing for extended periods, and performing exercises that, prior to surgery, he had been able to perform with no difficulty.

Represented by recruited counsel, Wesley sues Warden Charles Truitt, Nurse Practitioner Olufunmilola Ayankoya, Dr. Marlene Henze, Nurse Practitioner Brianna Orr, Nurse Practitioner Helen Bruckner, Nurse Mitchell, and five Jane Doe nurses, arguing that each was deliberately indifferent to his medical needs in violation of the Eighth Amendment. He is also suing the medical staff's employer, Wexford Health Sources ("Wexford"), a healthcare service provider that contracts with IDOC, alleging *Monell* liability. Now before the court are motions for summary judgment filed by Defendants Warden Truitt [119], Dr. Henze [99], Nurse Practitioner Orr [104], Nurse Practitioner Bruckner [106], and Wexford [110]. For the reasons stated below, the motions are granted.

## BACKGROUND

### I. Factual Background

The facts laid out below are taken from the parties' respective Local Rule 56.1 filings, as well as the record evidence submitted by the parties.[2] As it must at summary judgment, the court

---

[2] The facts set forth here are presented in the parties' statements of fact pursuant to this court's Local Rule 56.1. Henze's Local Rule 56.1 Statement of Material Facts is cited here as "Henze SOF [103] ¶ ___." Orr's Local Rule 56.1 Statement of Material Facts is cited here as "Orr SOF [108] ¶ ___." Wesley did not file a response, Additional Statement of Facts, or brief in opposition in response to either Henze or Orr's motions for summary judgment, so the court treats the facts therein as undisputed. *Nichols v. Martinez*, No. 22-CV-04689, 2026 WL 851265, at *3 (N.D. Ill. Mar. 27, 2026) ("A nonmoving party's failure to admit or deny facts as presented in the moving party's [Rule 56.1(b) statement] or to cite to any admissible evidence to support facts presented in response by the nonmoving party render the facts presented by the moving party as undisputed.").

Bruckner's Local Rule 56.1 Statement of Material Facts is cited here as "Bruckner SOF [108] ¶ ___." Wesley's Response to Bruckner's Local Rule 56.1 Statement is cited here as "Pl.'s Response to Bruckner SOF [131] ¶ ___." Wesley submitted an Additional Statement of Facts in response to Bruckner's motion, cited here as "PSOF on Bruckner MSJ [133] ¶ ___." Bruckner's Response to Plaintiff's Additional Statement of Facts is cited here as "Bruckner Resp. to PSOF [150] ¶ ___."

Truitt's Local Rule 56.1 Statement of Material Facts is cited here as "Truitt SOF [121] ¶ ___." Wesley's Response to Truitt's Local Rule 56.1 Statement is cited here as "Pl.'s Response

takes disputed facts in the light most favorable to the nonmoving party. *See In re Greenpoint Tactical Income Fund LLC*, 168 F.4th 1002, 1007 (7th Cir. 2026).

**A. Wesley's Treatment**

Plaintiff Andrew Wesley has been in the custody of IDOC since 2005 and was an inmate at Stateville at all times relevant to this litigation.[3] (Truitt SOF [121] ¶¶ 1, 2.) An IDOC prisoner who experiences a day-to-day medical issue, like a sore throat, may sign up to be seen by filling out a written sick call request. (*See* Truitt Dep. [118-9] at 43:7–15.) From the record in this case, it appears that the medical staff handling sick call requests are most often registered nurses, not medical doctors or nurse practitioners, though, as discussed below, Wesley did eventually see Nurse Practitioner Bruckner in response to several of his sick call requests. Importantly, "only 'providers'—i.e., nurse practitioners and physicians—can make referrals to outside medical treatment, and the registered nurses responsible for sick call cannot do so." (PSOF on Wexford MSJ [130] ¶ 24.) On July 18, 2022, Wesley was seen for an annual physical at the Healthcare Unit in Stateville by Nurse Practitioner Olufunmilola Ayankoya, who noted "mild redness" in Wesley's mouth, as well as "pain swallowing." (PSOF on Truitt MSJ [136] ¶ 3.) She flagged these symptoms as indications of possible "tonsilitis." She also noted that Wesley had complained

---

to Truitt SOF [134] ¶ ___." Wesley submitted an Additional Statement of Facts in response to Truitt's motion, cited here as "PSOF on Truitt MSJ [136] ¶ ___." Truitt's Response to Plaintiff's Additional Statement of Facts is cited here as "Truitt Resp. to PSOF [153] ¶ ___."

Wexford's Local Rule 56.1 Statement of Material Facts is cited here as "Wexford SOF [112] ¶ ___." Wesley's Response to Wexford's Local Rule 56.1 Statement is cited here as "Pl.'s Response to Wexford SOF [128] ¶ ___." Wesley submitted an Additional Statement of Facts in response to Wexford's motion, cited here as "PSOF on Wexford MSJ [130] ¶ ___." Wexford's Response to Plaintiff's Additional Statement of Facts is cited here as "Wexford Resp. to PSOF [148] ¶ ___."

[3] Stateville was closed in late 2024 after Judge Andrea R. Wood of the Northern District of Illinois entered a preliminary injunction requiring IDOC to transfer all individuals in custody from Stateville to other IDOC facilities by September 30, 2024, due to severe infrastructural issues at Stateville. *Dobbey v. Weilding*, No. 13 C 1068 (N.D. Ill. Jan. 23, 2024), ECF No. 386.

about a lesion in his left thigh, and directed that he "'RTC [return to the clinic] in [four weeks]' if the issue persisted." (PSOF On Truitt MSJ [136] ¶ 3; Truitt SOF [121] ¶ 27.)[4] It appears that Wesley was under the impression that Nurse Practitioner Ayankoya would call him back to the clinic after these four weeks elapsed, though the language of the note does not indicate as such. (*See* Wesley Dep. [116-4] at 34:1-10.)

On the same day that he saw Nurse Practitioner Ayankoya, Wesley wrote a letter to Warden Charles Truitt with the subject "Re: Healthcare Unit," stating:

> I am writing you because today I went over to the H.C.U. to have a routine physical. I was seen by NP Lola. After she completed my physical I informed her about a small knot that I discovered on my left thigh and how painful it is to the touch. She ask me was I wearing gym shorts underneath my pants, and I told her no! She refused to have a look at it because I wasn't wearing gym shorts underneath my pants, and she told me that she will call me back in a few weeks to have a look at it. Can you please look into this matter for me.[5]

(PSOF on Truitt MSJ [136] ¶ 18; [124] at 176.)

Defendant Truitt questions the veracity of Wesley's claim that he sent this letter. Truitt contends that Wesley "does not recall if his July 18, 2022 letter to Truitt was retrieved from his cell by a correctional officer" (Truitt SOF [121] ¶ 54), but this is disputed, as Wesley testified at his deposition that he did see a correctional officer take the letter from the bars where he had

---

[4] Wesley states that "Ayankoya note[d] Wesley's 'left thigh lesion'" in his medical notes but wrote that "she was 'unable to assess @ this time." The medical records provided by Wesley do not contain this language. Wesley cites to "Ex. A at (7800-043) 0117-18, (7800-043) 0284-5." Pages 117 and 118 are not in the record (*see* Pl.'s Ex. A [141-1]) and pages 284 through 285 do not contain the quoted language. *See Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007) ("In considering a motion for summary judgment, the district court is not required to scour the record in search of evidence to defeat the motion; the nonmoving party must identify with reasonable particularity the evidence upon which the party relies."). Further, Wesley cites to his Second Amended Complaint to support his assertion that Nurse Ayankoya refused to examine the tumor on Wesley's left thigh, but citation to a complaint is improper in a LR 56.1 statement. *Mosley v. City of Chi.*, 614 F.3d 391, 400 (7th Cir. 2010) (explaining that citing a complaint is "not the proper standard for summary judgment" as the non-movant is "required to offer support for those allegations" at the summary judgment stage).

[5] Regarding the contents of his letter, Wesley again cites his complaint for support, which is improper at the summary judgment stage. The court nevertheless considers the letter because Defendant Truitt has cited and attached it as an exhibit. ([124] at 176.)

placed it. (Pl.'s Resp. to Truitt SOF [134] ¶ 54; Wesley Dep. [116-4] at 36:1–4.) Truitt also asserts that "[t]here is no evidence that Truitt personally received Plaintiff's alleged July 18, 2022 letter," and that he (Truitt) "does not specifically recall receiving or forwarding any letter from Plaintiff from July 18, 2022, to the HCUA [Heathcare Unit Administrator] or DON [Director of Nursing]." (Truitt SOF [121] ¶¶ 55–56.) If he had received Wesley's July 18 letter, Truitt testified, "by common practice" his executive secretary would have provided him with a copy of it, and in general "the substance of [his] letter would have been sent to the director of nursing or the health care unit administrator to ensure that . . . they were going to call him back to follow up on this matter." (Pl.'s Resp. to Truitt SOF [134] ¶ 55; Truitt Dep. [118-9] at 89:17–90:15.) As noted, Truitt disputes that he received the letter, and it is undisputed that he took no action about any complaint from Wesley at this time.

From the time he saw Nurse Practitioner Ayankoya in July until October 25, 2022, Wesley exclusively saw nurses through Stateville's sick call process. On August 25, 2022, Wesley was seen for a nurse sick call by an unidentified nurse. The nurse's notes from the visit state that Wesley "ha[d] a protrusion from left leg," and that a "provider was supposed to follow up with him." (PSAF [136] ¶ 4; Stateville Medical Records [141] at 5.) The nurse stated the plan of care was for Wesley "to see provider to discuss left thigh protrusion." (*Id.*)

Three days later, on August 28, 2022, Wesley was again seen for a nurse sick call, this time by Nurse Loveth Kufu,[6] again complaining of the bump on his left thigh.[7] (PSOF on Truitt

---

[6] The parties refer to this nurse as "Nurse Kufu," though, as discussed below, the list produced by Truitt's counsel appears to indicate the nurse's name was actually "Ekufu." (*Compare* PSOF on Truitt MSJ [136] ¶ 5 *with* Ex. F [143-7] at 3.) Because the correct spelling is unclear, the court adopts the parties' spelling of this name.

[7] In his Statement of Facts regarding Wexford's motion for summary judgment, Wesley asserts that a list of the identity of the nurses who saw him on sick call between August and October 2022 was produced by Truitt's counsel on March 24, 2025. (PSOF on Wexford MSJ [130] ¶ 6 (asserting that the nurses were "Loveth Ekufu" on August 28, 2022; Mitchell McGladdery on September 5, 2022; and Jannessa Domercant on October 15, 2022.).) He further asserts that these nurses were all Wexford employees. Wesley's only citation is to "Ex. A (78000-043) 5906–5911." Exhibit A, however, does not contain the cited pages. The list of nurses' identities appears

MSJ [136] ¶ 5; Stateville Medical Records [141] at 6.) Nurse Kufu noted that Wesley described pain from his left thigh as "constant," and rated the pain as "6/10." (*Id.*) Nurse Kufu characterized Wesley's "pain while walking" as a "sign[] of obvious discomfort"; Kufu distributed 18 tabs of Ibuprofen 200mg for immediate pain relief and advised Wesley to "[r]eturn to see [a] provider if symptoms worsen or interfere with daily functioning." (*Id.*) Nurse Kufu did not ultimately refer Wesley to see an MD, but Wesley acknowledged in a later-filed grievance that the nurse had prescribed pain medication for him. (*Id.*; Truitt Resp to PSOF [153] ¶ 5; Sep. 14 Grievance [143-2] at 17.)

On September 5, 2022, Wesley again requested a sick call visit for the bump on his left thigh and this time was seen by Nurse Mitchel McGladdery. (PSOF on Truitt MSJ [136] ¶ 6.) Nurse McGladdery's notes state that Wesley reported his "left thigh started hurting" two weeks prior to the visit, that "the mass has gotten bigger," that Wesley "may have boil," and that Wesley was "profusely rubbing the site, stating it itches." (*Id.*; Stateville Medical Records [141] at 7.) McGladdery noted that Welsey would see a provider for further assessment, and that he informed Wesley "not to touch" the affected area. (*Id.*)

The next day, on September 6, 2022, Wesley drafted a second letter to Truitt with the subject line "Re: Healthcare Unit."[8] In this second letter, he stated

> I am sorry to bother you again, but it's been about a month and a half or two since I last wrote to you about this matter. As I have told you befor[e], I went to H.C.U. on 7-18-22 for a routine physical. I was seen by NP Lola. I told her about a knot I found on my left thigh and how it was hurting. She refused to look at it because I wasn't wearing gym shorts underneath my pants, and she told me that she would call me back, but never did. Since then the knot has grown, and still painful to the touch. Again, can you please look into this matter for me and let me know something.

---

elsewhere in the record, in an email from Truitt's counsel to Wesley's counsel. (Ex. F [143-7] at 3.) The court cautions Wesley's counsel that when faced with such errors in citation, the court is empowered to disregard the party's unsupported proposition.

[8] Again, Wesley cites to his Complaint regarding the contents of the letter. Though this is improper, the court considers the letter as it appears elsewhere in records produced by Defendant Truitt. ([124] at 178.)

(PSOF on Truitt MSJ [136] ¶ 21; [124] at 178.) The letter makes no mention of Wesley's sick call visits on August 5, 2022, August 28, 2022, or even just one day earlier on September 5, 2022.

The September 6 letter is unsigned, and it does not include Wesley's name or inmate number. (Truitt SOF [121] ¶ 53.) And during his deposition, when Truitt was asked about whether his executive secretary provided him with a copy of the September 6 letter, Truitt again responded that he was not sure, but that "just out of habit and past practice, any letter that's received in our office is presented to me for review." (PSOF on Truitt MSJ [136] ¶ 22; Truitt Dep. [118-9] 94:11–95:4.) Truitt acknowledged that if he had received the September 6 letter, its contents would have required "[d]ual follow-up, one, as to why my direction [in response to the July 18 letter] wasn't followed, and, two, if you said that you were going to see him in three weeks, why are we now nearly two months later." (Truitt Dep. [118-9] at 96:10–13.) When asked in response whether Truitt ever had such discussions, he responded that he had not. (*Id.* at 96:14–17.)

On September 14, 2022, Wesley submitted a grievance alleging a delay in his medical care. He outlined the events described above, and complained that he had not yet been seen by a doctor for the knot on his thigh. (Truitt SOF [121] ¶ 38; PSOF on Truitt MSJ [136] ¶ 25; September 14 Grievance [143-2] at 16–17.) This grievance was reviewed by a correctional counselor on October 11, 2022 (why the review was delayed by nearly a month is unexplained). The grievance officer noted that Wesley had been "added on to see a doctor" the following day, and denied the grievance as moot. (Truitt SOF [121] ¶ 39; Grievance Officer's Report [143-2] at 15.) The record suggests this visit with a "doctor" (or other "provider") happened on October 25, when Wesley was seen by Defendant Nurse Practitioner Brianna Orr, as discussed in greater detail below.

On October 15, 2022, Wesley again requested to be seen at sick call visit for his left thigh bump. Nurse Jannessa Domercant examined him and noted Wesley's report that the lump had "started as a pencil eraser size in July and was red but has since faded to normal skin color," and was "now the size of a quarter." (PSOF on Truitt MSJ [136] ¶ 7; Stateville Medical Records [141]

at 8.) She further noted that the lump was "painful when palpated but not from normal activity," and that Wesley described the lump as "hard" and "nonmovable." (*Id.*) She concluded the note by indicating that Wesley had no "s/sx [signs or symptoms] of distress at this time." (*Id.*) Follow up plans were noted as "PSC + RNSC PRN," which Truitt translates as "continued sick call visits as needed." (*Id.*)

On October 25, 2022, Wesley was seen in the Healthcare Unit by Nurse Practitioner Orr "to discuss a knot on the side of [left] thigh." (PSOF on Truitt MSJ [136] ¶ 9; Stateville Medical Records [141] at 9.) Orr documented Wesley's report that he first noticed the knot "about 3 months ago after his physical," that the knot was "sometimes painful to the touch, but for the most part it is not bothersome," and that "it was small [and] reddened initially, but it has grown over time." (*Id.*) Orr noted that the knot had "2.5cm round, firm nodularity." Her plan of care indicated that a "U/S [ultrasound]" was "ordered for further evaluation of [the] l[eft] thigh mass," and that "[f]urther recommendation" was "pending result review." (*Id.*)

When asked during his deposition why he named Nurse Practitioner Orr as a Defendant, Wesley responded as follows: "Because when I explained to her what was going on with me and the pain that I was going through and the medication that was prescribed was ineffective and I needed like something a little stronger and she could have provided it, but she refused to provide it." (Wesley Dep. [116-4] at 102:16–21.) Orr explained in her deposition that she "did not discuss pain medication" with Wesley during that visit and did not prescribe such medication during the visit because Wesley told her that the lump was "for the most part . . . not particularly bothersome." (Orr SOF [108] ¶¶ 50–51; Orr Dep. [116-5] at 93:14–94:6.) Nurse Practitioner Orr did, however, recommend that Wesley have an ultrasound. (Orr SOF [108] ¶ 52.) And on the same day that Orr saw him, Dr. Marlene Henze—a physician, Wexford employee, and the Medical Director at Stateville during the relevant time period—completed an IDOC Medical Special Services Referral and Report, referring Wesley to UIC Medical Center for an ultrasound ("U/S") of his left thigh mass. (Henze SOF [103] ¶¶ 2, 7; Truitt SOF [121] ¶¶ 18–19, 24.)

The ultrasound did not occur immediately, and over the next several weeks, Wesley had additional sick call visits concerning the knot on his thigh and the anticipated ultrasound scan. On November 4, 2022, he was seen by Defendant Nurse Practitioner Helen Bruckner, who had reviewed Wesley's previous medical notes before the appointment. (PSOF on Bruckner MSJ [133] ¶¶ 14, 15.) Wesley testified that he went to see Nurse Bruckner "to see if [he] c[ould] get . . . pain medication" and to "see how long it would take" for him to get his ultrasound approved. (Wesley Dep. [117-1] at 114:25–115:8.) Bruckner's notes show that she examined a bump on Wesley's left thigh that had lasted for three months, and was by then a "raised circular area" that was "about quarter size." Under her follow-up plans, Bruckner noted that she would "check on U.S. [ultrasound] status," and later noted that the ultrasound was "approved awaiting schedule." (PSOF on Truitt MSJ [136] ¶ 10; Stateville Medical Records [141] at 10.) Bruckner also noted the plan to "f/u [follow up] [in] one week." (*Id.*)

When later questioned about her assessment of Wesley's knot, Nurse Bruckner agreed that "a bump on the[] leg that's a quarter size" was "not normal," but could "be something benign as a cyst, boil, or lipoma." (Bruckner SOF [109] ¶ 22; Bruckner Dep [117-2] at 127:16–22.) Indeed, prior to July 2020, Wesley had had boils three to four separate times, each of which "went away on its own once it released itself." (Bruckner SOF [109] ¶ 6; Wesley Dep. [117-1] at 68:13–69:5).) On another occasion, there was an abscess over his rib, which he noticed sometime in 2020, and he was informed that he had a lipoma (soft fatty tissue), for which there was "nothing to do for it medically." (*Id.* ¶¶ 7–8; Wesley Dep. [117-1] at 70:4–71–5.)

Nurse Bruckner did not prescribe pain medication for Wesley during the November 4 visit. She says "he did not complain of pain" during the visit (Bruckner Dep. [117-2] at 80:1–2, 87:14–17); Wesley disputes this, citing only his complaint, and he concedes that there is no reference in the November 4, 2022 notes to any complaint of pain. (Bruckner SOF [109] ¶ 23; Pl.'s Resp. to Bruckner SOF [131] ¶ 23; Wesley Dep. [117-1] at 119:6–9.)

On November 22, 2022, Wesley was again seen for sick call by Nurse Mitchell McGladdery.[9] McGladdery noted that Wesley still had pain in his left leg from the knot, and that Wesley rated the pain "10/10" lasting for 3 days. (PSOF on Truitt MSJ [136] ¶ 11; Stateville Medical Records [141] at 12.) McGladdery gave Wesley 18 tablets of Ibuprofen 200 mg to be taken over the next three days. (*Id.*) Nurse McGladdery's follow-up plans were to "see when [the] ultrasound [was] scheduled." (*Id.* at 14.) In a separate note, he later wrote that the "ultrasound [was] referred but not scheduled." (*Id.*)

The next day, on November 23, 2022, Wesley was again seen for sick call by Nurse Bruckner. (PSOF on Truitt MSJ [136] ¶ 12; Stateville Medical Records [141] at 11.) Bruckner noted that Wesley told her that he felt the knot "pop because [he] was laying [sic] on it." (*Id.*) During the visit, she informed Wesley that his ultrasound "ha[d] been approved" and that his appointment was "pending." (*Id.*) She then describes the knot as a "firm circular half-dollar size area" with "no discharge" and noted that it was tender when touched. (PSOF on Truitt MSJ [136] ¶ 12; Stateville Medical Records [141] at 11.) The record showed that Wesley had been referred for an ultrasound; Bruckner's follow-up plans noted "no new orders." (*Id.*) Bruckner later testified that she assumed the bump was a boil or cyst based on Wesley's characterization that he felt it pop. (Bruckner SOF [109] ¶ 28.) Wesley believes Nurse Bruckner should have given him pain medication during that visit "based on [his] complaints."[10] (*Id.* ¶ 32; Wesley Dep. [117-1] at

---

[9] The court notes that Wesley named a "Nurse Mitchell" as a Defendant in this case. It is unclear whether Nurse McGladdery is the "Nurse Mitchell" he refers to. In any event, Wesley has not filed a return of summons or waiver of service for Nurse McGladdery, or any other individual who may be the Nurse Mitchell he refers to in his complaint. For that reason, claims against Nurse Mitchell are dismissed. FED. R. CIV. P. 4.

[10] Wesley alleges that Bruckner's failure to prescribe him pain medication after noting his experience of pain violated Wexford's published Medical Guidelines. The Guidelines provide that a patient suffering from "[m]ild to [m]oderate pain" should be prescribed medication consisting of either acetaminophen or ibuprofen for acute pain, or meloxicam ointment for non-acute pain. (PSOF on Bruckner MSJ [133] ¶ 33; Wexford Medical Guidelines [141-1] at 309.)

Bruckner disputes Wesley's reliance on these documents, pointing out that the guidelines state clearly that the pathways outlined therein "do not replace sound clinical judgment, nor are they intended to strictly apply to all patients." (Bruckner Resp. to PSOF [150] ¶ 33; Wexford

125:20–126:4.) But although Bruckner noted the tenderness of the lump, she nevertheless determined that Wesley "was not in acute distress" and "using her medical judgment," determined that she would "not prescrib[e] pain medication because there was no indication that pain medication was warranted." (Bruckner SOF [109] ¶ 30.)[11]

Bruckner testified that, following the November 23 appointment, she followed up with the scheduler to check on the status of Wesley's ultrasound and "make sure there was an appointment pending," which the scheduler, according to Bruckner, confirmed. (Bruckner SOF [109] ¶ 31.) Wesley takes issue with this line of testimony, arguing that it contradicts other portions of Bruckner's deposition in which she stated she was "not sure" who she would talk to if she was "concerned and wanted to expedite an ultrasound." (Bruckner Dep [117-2] at 82:3–5.) But these two lines of testimony are not inherently inconsistent: Bruckner's lack of clarity regarding who she would talk to about *expediting* an ultrasound appointment has no bearing on her knowledge regarding who she would talk to in order to confirm that such an appointment was pending.

Less than a week later, on November 28, 2022, Wesley was again seen for sick call for the bump on his left thigh. (PSOF on Truitt MSJ [136] ¶ 13; Stateville Medical Records [141] at 15.) The treating nurse (unnamed in the court record) noted that Wesley was being seen for follow-up regarding his left thigh pain, that he had "recently been seen by [a] provider," that he

---

Guidelines [141-1] at 309.) On this point, Bruckner also cites to Dr. Funk's testimony that medical guidelines do not set the standard of care, but rather serve as "reference materials," and that practitioners are expected to treat patients "pursuant to their education, training, and experience." (Bruckner Resp. to PSOF [150] ¶ 33; Funk Dep. [118-2] at 252:17–253:8.) In any event, Bruckner's alleged violation of Medical Guidelines does not by itself constitute a violation of the Eighth Amendment.

[11] Wesley responds to this paragraph with one word: "Deny." (Wesley Resp. to Bruckner SOF [131] ¶ 30.) Under LR 56.1, such one-word denials are insufficient to create a dispute of fact.

had been informed of "a pending US [ultrasound]," and that he would be "notified from healthcare when scheduled." (*Id.*) The nurse also noted that Wesley was provided Tylenol for pain. (*Id.*)

On December 1, 2022, Wesley was seen by Nurse Practitioner Bruckner yet again for the bump on his left thigh. (PSOF on Truitt MSJ [136] ¶ 14; Stateville Medical Records [141] at 17.) Bruckner's notes indicate that she "advise[d]" Wesley that they were "still waiting [for] an appointment" for his ultrasound and again noted in follow-up plans that there were "no new orders." (*Id.*) During the December 1 visit, Bruckner neither examined Wesley's bump nor prescribed pain medication. In deposition testimony, Bruckner justified these decisions by noting Wesley's lack of complaints regarding the lump, her observation that he appeared to be ambulating well during the visit, and his continued effort to determine when he would be going for his ultrasound. (Bruckner SOF [109] ¶¶ 33–35; Bruckner Dep. [117-2] at 105:4–107:10.)[12]

On December 18, 2022, Wesley saw another unnamed nurse for sick call. (PSOF on Truitt MSJ [136] ¶ 15; Stateville Medical Records [141] at 19.) The nurse's notes state that Wesley "want[ed] to know what's going on with his ultrasound," and that the nurse informed Wesley that staff would follow up with the scheduler. (*Id.*)

Finally, on December 29, 2022, staff at UIC Medical Center completed an "US [Ultrasound] Lower Extremity Non Vascular." (Henze SOF [103] ¶ 8; Medical Records [115-1] at 1.) The attending radiologist at UIC found "2 nonvascular complex fluid collections within the left lateral thigh the largest measuring 4.1 cm." and noted that "[t]hese are suspicious for abscesses." (Henze SOF [103] ¶ 9; U/S Result [115-2 ] at 1.)

When Wesley was seen again by an unnamed medical provider five days later, he reported that he was experiencing "intermittent" "throbbing" pain, with pain measuring at 7, 8, or 10 that worsened when Wesley lay on his left side. (PSOF on Truitt MSJ [136] ¶ 16; Stateville

[12] Wesley again makes several one-word denials or denials without citation to the appropriate record in response to Defendant Bruckner's LR 56.1 Statement of Fact. (Pl.'s Resp. to Bruckner SOF [131] ¶¶ 34–35.) The court disregards these denials.

Medical Records [141] at 21.) The nurse noted that Wesley had recently had an ultrasound of his left thigh and that he would need to "discuss [with the] provider regarding US result," and again provided him with 18 Ibuprofen 200 mg tablets. (*Id.*)

Dr. Henze reviewed UIC Medical Center's Referral and Report form and the ultrasound results on January 6, 2023. She saw Wesley for a visit later that same day, and scheduled him for incision and drainage of the mass the next week. (Henze SOF [103] ¶¶ 8-10; Medical Records [115-1] at 1.) Dr. Henze completed the incision and drainage procedure on January 13, 2023, and made the following notes:

> After informed consent was given verbally & then form signed for excision of painful 2 ½ cm x 3 cm firm mass to left lateral, upper thigh, the area was prepped & draped in a sterile fashion. The area was anesthetized with 1% lido with epi approx. 10 ml total, at the start of procedure & during based on patient's level of pain. An approximately 3 cm incision was made vertically over the mass. The mass was dissected from the over-lying skin & surrounding tissues. The specimen was removed whole & with some surrounding fatty tissue and sent for a biopsy.

(Henze SOF [103] ¶ 11.) She further noted: "the specimen was approximately 3 cm x 2 cm x 2 cm. Closure would certainly result in seroma or infection or other fluid collection." (*Id.*) Finally, she prescribed pain medicine Tramadol 50 mg three times day for 10 days; antibiotic Keflex 500 mg 10 days and Tylenol 1000mg every 6 hours as needed for 30 days. (*Id.*)

At a follow-up visit on January 24, 2023, Dr. Henze completed a dressing change, and because Wesley complained of increased pain, she "increased Tramadol pain medication to 100 mg three times a day for 21 days." (*Id.* ¶ 12.) Moreover, because the result of the biopsy had come back (it is unclear when) as "pleomorphic malignancy" (i.e., cancer), Dr. Henze referred Wesley to UIC radiation oncology. (*Id.* ¶ 13.) When she saw him again on February 14, 2023, Dr. Henze charted that Wesley's wound had "filled in nicely" and was "now skin level." (*Id.* ¶ 14.) She also noted that Wesley was "anxious to get [his cancer] workup started," and that he asked her specifically when his MRI would be. Dr. Henze reassured him that UIC had moved the date up several times, and he was "encouraged" by this. (*Id.*) Still, Henze warned Wesley that his

cancer was "aggressive," and that he would "be going through a lot to treat" it, including "wider resection" and "radiation therapy." (*Id.*)

Wesley returned to UIC for 25 radiation treatments based on the recommendations of UIC's cancer specialists. (*Id.* at 22.) It is unclear from the record when these radiation treatments began, though UIC medical records show Wesley "received preop radiation . . . on 4/5/2023-5/10/2023." (UIC Medical Records [143-3] at 7.) After 25 treatments, on June 15, 2023, cancer surgeon Dr. Salti performed radical resection and reconstruction surgeries to remove the mass. (Wesley Dep. [115-3] at 147:18–148:17; PSOF on Truitt MSJ [136] ¶ 17.) Wesley continues to have residual effects from the surgery, including "throbbing pains when walking distances in excess of a mile[,] standing for extended periods[, and] performing exercises he used to do." (PSOF on Truitt MSJ [136] ¶ 2.)

**B. Truitt**

Defendant Warden Charles Truitt served as the warden of Stateville beginning in 2022. (Truitt SOF [121] ¶¶ 4–5.) In this position, Truitt oversaw "general facility operations, the facility budget, individuals in custody, and staff." (*Id.* ¶ 7.) Truitt also "delegate[d] responsibilities, managerial authority, and administrative authority to his designees, including but not limited to assistant wardens and facility directors." (*Id.*) According to Truitt, the Heathcare Unit Administrator employed by the state was one of the staff members to whom he delegated "managerial and administrative authority" during the relevant time period. Truitt also testified that the HCUA position was in fact vacant for some time around October 25, 2022. (Truitt SOF [121] ¶ 8; Pl.'s Resp to Truitt SOF [134] ¶ 8; Truitt Ex. 2 [124] at 96, 110, Truitt Dep. at 62:2–7; 118:14–121:8.) It is unclear from the record whether that vacancy was filled, but Truitt asserts that when there "was no HCUA, the Director of Nursing (a Wexford employee) would be charged with ensuring compliance with administrative directives and referral scheduling." (Truitt SOF [121] ¶ 9.) The HCUA and the Director of Nursing both reported to the Assistant Warden of Programs, who then reported to the Warden. (*Id.* ¶ 10.) Yet another administrative officer, the Medical

Director, was tasked with "oversee[ing] the daily operations of the healthcare unit by working with providers and medical staff." (*Id.* ¶ 11.) Wesley contends that under IDOC Administrative Directive 01.02.111, the Warden is "responsible for guiding the development . . . of a local strategic plan for the facility . . . [which] shall include information and goals relating to . . . health care services, including both medical and mental health care." (Truitt Ex. 8 [124] at 88.) But Truitt asserts that the Medical Director is the "sole medical authority for the facility." (Truitt SOF [121] ¶ 12.)

The parties also disagree about who was responsible for compliance with IDOC administrative directives. During the relevant time periods, Stateville underwent annual compliance reviews to evaluate its compliance with those directives. (Truitt Ex. 2 [124] at 88; Truitt Dep. at 30:24–31:9.) These compliance reviews consisted of both internal audits, conducted by the "facility audit team," and external audits, conducted by a "team that comes from the agency," presumably IDOC. (*Id.*) Truitt confirmed in his deposition testimony that he received a copy of the audit results for Stateville showing that staffing levels were lower than the prescribed allocations in 2021, 2022, and 2023. (*Id.* at 88, 31:10–32:4; PSOF on Truitt MSJ [136] ¶ 27.) Truitt nevertheless did not recall any negative findings with respect to health care services at Stateville. (*Id.* at 88, 31:10–12; PSOF on Truitt MSJ [136] ¶ 27.) He agreed that it was "possible" that "shortages in health care providers [could] impact" the provision of health care services, but asserted that he had no "personal knowledge as to specific shortages in the health care." (Truitt Ex. 2. [124] at 118, Truitt Dep. at 152:4–17; Truitt Resp. to PSOF [153] ¶ 27.)

**C. Wexford**

As noted, Plaintiff has named Wexford, the contracted health care provider at Dixon, as a Defendant, alleging that through its contract with IDOC, Wexford s responsible for "[p]rovid[ing] comprehensive medical and mental health examination on every offender and in compliance with all applicable Administrative Directives." (PSOF on Wexford MSJ [130] ¶ 23; Wexford Contract [143-5] at 6.) Wesley invokes Administrative Directive 04.03.103 in particular as a directive that

he claims Wexford failed to effectively implement in the course of his care. (PSOF on Wexford MSJ [130] ¶ 23.) Section (II)(F)(6)(c) of that directive instructs that "When an offender's request for non-emergency medical attention results in referral to a primary care physician by the screening health care staff, the primary care evaluation shall take place within 72 hours or upon the next scheduled visit by a primary care physician." (AD 04.03.103 [112-12] at 4.) The parties agree that such primary care evaluations may only be completed by nurse practitioners or physicians, but they disagree regarding Wexford's responsibility in implementing the directive's requirements

In arguing that Administrative Directive 04.03.103 is "applicable to Wexford's staff and Wexford is responsible for its implementation," Wesley cites to the deposition testimony of Dr. Arthur Funk, Wexford's corporate representative: "Q: So for the record, this document is titled Illinois Department of Corrections Administrative Directive, Number 04.03.0103; title, Offender Health Care Services Effective 1/1/2020; correct? A: Yes. Q: Is this one of the IDOC policies applicable to Wexford staff? A: Yes." (Funk Dep. [118-2] at 26:21–27:4; PSOF on Wexford MSJ [130] ¶ 23.) The court notes, further, that Truitt testified that the Director of Nursing, a Wexford employee, was responsible for "ensuring compliance with administrative directives and referral scheduling" when the Health Care Unit Administrator position was vacant (as it was around October 2022). (Truitt PSOF [121] ¶ 9; Truitt Ex. 2 [124] at 110, Truitt Dep. at 118:14–121:8.)

Further, Wesley asserts that "[f]ailure to provide a referral within 72 hours is a violation of IDOC policy,"[13] citing to Dr. Funk's testimony as well as that of Warden Truitt. (PSOF on Wexford MSJ [130] ¶ 23.) Wexford contends this standard can be met if a prisoner is seen "upon the next scheduled visit by a primary care physician." (Wexford Resp. to PSOF [148] ¶ 23; Funk Dep. [118-

---

[13] Wesley here rests many of his arguments against Wexford on Wexford's alleged violation of IDOC policy. The court notes, however, that without more, "a violation of state law or prison regulations is not sufficient to demonstrate a violation of the Constitution." *Hammer v. Bortz*, No. 23-1842, 2024 WL 2559204, at *4 (7th Cir. May 24, 2024) (citing *Courtney v. Butler*, 66 F.4th 1043, 1052–53 (7th Cir. 2023)).

2] at 57:3–13; Truitt Dep. [118-9] at 129:2–19.) Yet Warden Truitt acknowledged that the delay between Wesley's August 25, 2022, referral to see a primary care provider and his eventual visit with Nurse Practitioner Orr on October 25, 2022, amounted to a "violation of policy," and that such a delay would "warrant further investigation" to ascertain "who is exactly responsible" for such a violation. (PSOF on Wexford MSJ [130] ¶ 26; Truitt Dep. [118-9] at 113:13–114:18.) As Wesley notes, Dr. Funk acknowledged that Wesley "should have seen" a provider prior to October 25, 2022 if a provider "was available to be seen." (Funk Dep. [118-2] at 241:2–6.)

Wesley's claim against Wexford includes his assertion that "Wexford nurses are provided minimal, if any, training on the content of IDOC policies applicable to their practice," but the evidence he cites does not directly support this assertion. (PSOF on Wexford MSJ [130] ¶ 23; Bruckner Dep. [117-2] at 31:18–24 ("Q: Are clinical staff, nurse practitioners, are they ever[] trained on the policies and procedures while working at Stateville? . . . A: I don't know." (objections omitted).) While another witness, such as the Director of Nursing at Stateville, may have been able to speak in more detail about nursing training, Wesley did not depose the Director of Nursing.

Dr. Henze, Stateville's Medical Director, is also employed by Wexford and was "responsible for resolving problems related to patient safety issues and patient complaints/ grievances." (Henze Dep. [118-4] at 27:15–28:10.) While Henze "did not have a role" in responding to grievances, she explained during her deposition that when she was made aware of a grievance by the grievance committee or the warden via her site manager, she would "maybe see a patient after the grievance was answered to help resolve things." (*Id.*) Henze never met with Wesley regarding his September 14, 2022 grievance because she was not aware that Wesley had filed it. (*Id.* at 102:18–21.)

**D. Expert Reports**

Wesley retained Dr. Kusha Patel—a hospitalist with over 10 years of experience and training, an assistant professor of Medicine at the University of Illinois College of Medicine, and the Chief Medical Information Officer at Mercy Health—to opine on whether Wesley's course of

treatment "met the standard of care expected of a reasonably prudent physician or practitioner under similar circumstances." (Patel Report [117-8] ¶¶ 6, 9.)

Patel testified during his deposition that his "opinions were focusing on [the] timeline of events, not the care itself," and therefore he did not consider the defendants' deposition testimony in preparing his expert report. (Bruckner SOF [109] ¶ 51; Patel Dep. [117-7] at 49:15–50:3.) Based on the timeline outlined in Wesley's medical records, Patel found that various delays—including "[t]he eleven month delay" between Wesley's first presentation of symptoms and his surgery, the "nearly six month delay" between his first presentation of symptoms and "his first appointment with a doctor," the "nearly three month delay" between his first presentation of symptoms and his being referred for an ultrasound, and the "delay" between when Wesley was referred for an ultrasound and the date the ultrasound eventually occurred some two months later—all violated the standard of care. (Patel Report [117-8] ¶¶ 39–41.)

Further, Patel noted that progress notes in Wesley's medical records reflected "a lack of continuity in care, where the documenting nurses were apparently unaware of one another's notes, given the different differential diagnoses they made," and given that the nurses appeared to be "unaware . . . that Plaintiff's condition was persistent or that he was already subject to pending provider referrals." (PSOF on Wexford MSJ [130] ¶ 33.)

In a rebuttal report, Patel opined that "the delays in Mr. Wesley's seeing a provider were, more likely than not, caused by the open-ended nature of IDOC Administrative Directive 04.03.103's requirement that primary care evaluations take place 'within 72 . . . hours or the next scheduled visit by a primary care physician,'" and he faults Wexford for failures in "implementation" of that IDOC Directive. (Patel Rebuttal Report [115-10] ¶ 21.) He finds that "[e]ither there was a provider available within 72 hours and Wexford failed to meet that obligation, or there were no providers available for Mr. Wesley for 2 months," and in either case, this delay constituted a "violation of the standard of care." (*Id.* ¶ 27.) Importantly, nowhere in his report or

rebuttal report does Dr. Patel find that the delays Wesley complains of were reckless, or that they exhibited deliberate indifference.

Patel also opined that the delay in treatment had impacts on the physical limitations and pain experienced by Plaintiff to this day. (Patel Report [117-8] ¶ 55 ("Had Wesley received medical care in accordance with the standard of care, he would likely have not needed as much of his thigh excised, resulting in greater mobility and, more likely than not, less on-going pain.").) This is because, according to Dr. Patel,

> Cancer tumors get larger over time, and in general, a larger cancer tumor requires more complex treatment than a smaller one. Smaller tumors are indicative of early stage cancers, that are often treated with localized therapy, such as surgery to remove the tumor or focused radiation therapy. A larger tumor is more likely to have a more complex treatment plan than a smaller tumor. Prolonged duration without treatment may increase risk of metastasis to other parts of the body and require a more extensive or complex surgery including removal of additional tissue, additional radiation, and systemic chemotherapy.

(Patel Report [117-8] ¶ 44.)

Citing the report of their own expert, Dr. Leonidas Koniaris, Defendants dispute that Wesley experienced any delay in treatment. (Wexford Resp. to PSOF [148] ¶ 39; Bruckner Resp. to PSOF [150] ¶ 38; Truitt Resp. to PSOF [153] ¶ 32.) Dr. Koniaris is a general surgeon and surgical oncologist trained at Johns Hopkins University Medical Center. (Henze SOF [103] ¶ 65.) He asserted that for treatment of subcutaneous tumors, "[i]nitiating treatment in a few months' time is ideal," that "rushing to the operating room or initiating care faster than such a timeline would not change prognosis," and that if all subcutaneous masses "were resected due to a small risk of sarcoma, the resultant morbidity and mortality rates from surgery would likely far exceed the benefit of an earlier biopsy." (Koniaris Rep. [115-6] at 8–9.) Dr. Koniaris deemed the observation of the mass on Wesley's leg for three months "reasonable"; in his view, "[o]bservation was the proper initial treatment" of the mass considering that "the vast majority of such masses are benign and not sarcoma." (*Id.* at 10.) Koniaris went so far as to "commend[]" Wesley's care

considering it was provided "during the COVID-19 pandemic, where cancer care nationally was noted to be severely delayed." (Bruckner SOF [109] ¶ 67; Koniaris Report [115-6] at 11.)

Koniaris also opined that "the tumor in its location [was] highly unlikely to have been painful," and "at most, it might have been associated with a small pulling sensation." (Bruckner SOF [109] ¶ 68; Koniaris Report [115-6] at 11.) He further opined that the cancerous mass beneath the cystic fluid was unlikely to have grown much during the course of Wesley's complained-of delay; "given that a large amount of [the bump] was cystic fluid, this demonstrates that the mass did not grow significantly, but instead it collected fluid around it." (Koniaris Report [115-6] at 10–11.)

Defendants also retained Nurse Practitioner Laurie Sabas to opine on whether the Nurse Practitioner Defendants in this case—Ayankoya, Bruckner, and Orr—as well as RN Mitchell acted with deliberate indifference in the provision of Wesley's medical care. (Sabas Report [117-11] at 2.) Sabas opined that "[w]henever possible, the first course of action" in response to complaints of pain "should always be for a provider to use pharmacologic alternatives to control pain (rest, ice or heat, and elevation) with the expectation for mild pain to be tolerated while addressing the inciting underlying issue." (Orr SOF [108] ¶ 58; Sabas Report [117-11] at 12.) "Based upon Mr. Wesley's presentations, histories, and objective exam findings," Sabas opined that "NPs Ayankoya, Orr, and Bruckner complied with the standard of care by continuing to monitor Mr. Wesley's soft tissue nodule absent the use of pain medication, as there was no clinical indication that such medication was warranted." (Orr SOF [108] ¶ 61; Sabas Report [117-11] at 12–13.)

Sabas further found that Wesley's "prior history of already having had boils and lipomas . . . would have increased suspicion and the likelihood that Mr. Wesley's left thigh lesion was a recurrence of a prior benign condition." (Orr SOF [108] ¶ 71; Sabas Report [117-11] at 13.) As to the alleged delay between the ultrasound order and the eventual completion of the ultrasound, Sabas opined that such a "two-month turnaround for a non-urgent, optional, routine diagnostic ultrasound is standard in the [medical] community." (Orr SOF [108] ¶ 72; Sabas Report [117-11]

at 14.) Sabas further opined that the appropriate response to Wesley's complaints of left thigh nodule pain that would meet the standard of care "would be to advise the patient to let the tissue rest while continuing to monitor the lesion." (Bruckner SOF [109] ¶ 77; Sabas Report [117-11] at 12.)[14]

Dr. Patel prepared a rebuttal report in response to Koniaris and Sabas's opinions. He opined that the "'observation' approach" found to be reasonable by these two experts was contrary to the standard of care because "neither boils, cysts, or lipomas can or should be observed for months on end when there are changes in characteristics such as size, pain, or mobility issues." (Patel Rebuttal Rep. [116-10] at 10.) Moreover, he faults these two experts for "minimiz[ing]" Wesley's reports and testimony concerning his pain where the record "reflects Mr. Wesley's contemporaneous complaints of pain to the registered nurses and nurse practitioners" throughout his course of treatment. (*Id.* at 8.)

## II. Procedural Background

Wesley filed his *pro se* complaint against Defendants Truitt, Henze, Ayankoya, Bruckner, Orr, Mitchell, and Jane Does #1–5 on May 5, 2023. (Complaint [1] at 1.) Wesley moved for attorney representation, citing the "seriousness of [his] injury (cancer, etc.)" and his likely need for medical experts. (Mot. For Attorney Representation [4] at 1.) The court granted that request. (Order [5] at 1.) Through recruited counsel, Wesley filed an amended complaint on August 17, 2023, naming Wexford Health Sources, Inc. as an additional defendant. (FAC [8] at 1.) Wesley raised four claims: (1) Count I against Defendants Ayankoya,[15] Bruckner, Mitchell, Orr, and the Jane Doe Nurses alleging a violation of his Eighth Amendment rights via deliberate indifference

[14] Wesley again responds to these paragraphs in Bruckner's LR 56.1 Statement of Facts with one-word denials. Without more, the court treats these facts as undisputed.

[15] On April 25, 2025, counsel for the Wexford Defendants filed a Suggestion of Death as to Nurse Practitioner Olufunmilola Ayankoya, with an attached death certificate. Because no party has filed a motion for substitution, and 90 days have elapsed since the time counsel filed Ayankoya's death certificate, Wesley's claims against Ayankoya are dismissed pursuant to FED. R. CIV. P. 25(a)(1).

to his serious medical need, pursuant to 42 U.S.C. § 1983, for their alleged failure to examine or treat Wesley's sarcoma symptoms, their delay in referring him to an off-site specialist, and their failure to follow up on the referral once it was placed; (2) Count II against Defendant Henze, again alleging a violation of his Eighth Amendment rights via deliberate indifference to his serious medical need, pursuant to 42 U.S.C. § 1983, for her alleged failure to promptly schedule or expedite Wesley's referral and for her allegedly deficient attempt to "remov[e]" Wesley's tumor; (3) Count III against Defendant Truitt alleging that Truitt is vicariously liable for the conduct of Defendant Nurses as facility staff and Wexford as Stateville's vendor and agent, and further alleging that Truitt failed to supervise Defendant Nurses, expedite Wesley's treatment, and follow up on referrals in response to Wesley's complaints; and (4) Count IV against Wexford for a violation of his Eighth Amendment Rights pursuant to 42 U.S.C. § 1983 alleging that Wexford "maintained policies and procedures at all relevant times that discouraged referral to escalated or off-site medical treatment." (FAC [8] ¶¶ 70–86.)

Defendants Henze, Orr, Bruckner, and Wexford moved for summary judgment on November 19, 2025 ([99, 104, 106, 110]) and Defendant Truitt moved for summary judgment on December 3, 2025 ([119]). On December 18, 2025, Wesley responded only to the motions by Wexford, Bruckner, and Truitt, filing opposition briefs, responses to these Defendants' LR 56.1 Statements of Facts, and his own LR 56.1 Statements of Additional Facts. As to Henze and Orr, Wesley has yet to respond to these Defendants' motions. The court deems Wesley's failure to oppose these Defendants' motions as a forfeiture of his claims against them, and his failure to file responsive LR 56.1 statements as admissions of those facts contained in Orr and Henze's respective statements. *Rabe v. United Air Lines, Inc.*, 971 F. Supp. 2d 807, 820 (N.D. Ill. 2013) ("If a party fails to properly oppose an argument raised in a motion for summary judgment, the claim is deemed waived and the non-moving party will lose the motion."). Henze and Orr's motions for summary judgment are granted as unopposed.

Truitt, Bruckner, and Wexford's motions are fully briefed.

# DISCUSSION

## I. Legal Standard

"Summary judgment is appropriate if 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 661 (7th Cir. 2016) (quoting FED. R. CIV. P. 56(a)). Parties genuinely dispute a material fact where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Stockton v. Milwaukee County.*, 44 F.4th 605, 614 (7th Cir. 2022) (quoting *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021)). "A party who fails to produce evidence sufficient to establish an element essential to that party's case on which they bear the burden of proof cannot survive a summary judgment challenge." *Id.* (citing *Zander v. Orlich*, 907 F.3d 956, 959 (7th Cir. 2018)).

## II. Analysis

"The Eighth Amendment's ban on 'cruel and unusual punishments' obligates prison officials to provide medical care to prisoners in their custody," and proscribes deliberate indifference to serious medical needs of prisoners. *Clemons v. Wexford Health Sources, Inc.*, 106 F.4th 628, 635 (7th Cir. 2024) (citation omitted). To succeed on a deliberate indifference claim, Wesley "must establish that [he] had an objectively serious medical condition and that [the Defendants were] deliberately indifferent to that condition." *Christensen v. Weiss*, 145 F.4th 743, 752 (7th Cir. 2025). Further, Wesley must show that Defendants' deliberate indifference injured him. *Stockton v. Milwaukee Cnty.*, 44 F.4th 605, 614 (7th Cir. 2022).

There is an objective and subjective component to a deliberate indifference claim. First, Wesley must show that he had an objectively serious medical condition. *Clemons*, 106 F.4th at 635. "An objectively serious medical condition is one that 'a physician has diagnosed as needing treatment' or that is so obviously serious 'that even a lay person would easily recognize the necessity for a doctor's attention.'" *McDonald v. Hardy*, 821 F.3d 882, 888 (7th Cir. 2016) (quoting *Knight v. Wiseman*, 590 F.3d 458, 463 (7th Cir. 2009)). Second, Wesley must show that the

Defendants acted with deliberate indifference when considering their subjective state of mind. Deliberate indifference means that the Defendants "knew of and 'consciously disregarded a serious risk to his health.'" *Clemons*, 106 F.4th at 635 (citation omitted). In other words, each Defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also draw the inference." *Stockton*, 44 F.4th at 615 (citation omitted). Deliberate indifference goes beyond negligence or gross negligence. *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010) ("[N]egligence, even gross negligence, does not violate the Constitution."). Deliberate indifference can be established through inference from circumstantial evidence. *Christensen*, 145 F.4th at 752. "'A delay in treatment may show deliberate indifference if it exacerbated the inmate's injury or unnecessarily prolonged his pain,' and 'even brief, unexplained delays in treatment may constitute deliberate indifference.'" *Lewis v. McLean*, 864 F.3d 556, 563 (7th Cir. 2017) (citation omitted). To establish deliberate indifference based upon treatment delays, however, a plaintiff must present "verifying medical evidence" that the delay, rather than the underlying condition, actually caused "some harm." *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 964 (7th Cir. 2019) (quoting *Jackson v. Pollion*, 733 F.3d 786, 790 (7th Cir. 2013)).

Defendants do not dispute that Wesley's sarcoma was an objectively serious condition. Instead, each Defendant argues that Wesley has failed to prove the subjective element of his claim—that they were deliberately indifferent to his condition—or that their deliberate indifference caused Wesley's injuries.

### A. Bruckner

Recall that Bruckner had three clinical encounters with Wesley, all after the referral for his ultrasound was already pending: November 4, 2022, where she examined the bump on his leg, recorded that it was about the size of a quarter, and noted plans to follow up regarding the status of his ultrasound; November 23, 2022, where Wesley complained that he felt the bump "pop" while he was lying on it; and December 1, 2022, where Bruckner informed Wesley that his

ultrasound referral remained pending, without examining the bump on his leg. Bruckner did not prescribe pain medication at any of these three visits.

Wesley faults Bruckner for "fail[ing] to provide pain relief" and failing to "develop an appropriate treatment plan" during and after these visits, despite Bruckner's awareness of his "ongoing pain and the seriousness of his condition during multiple clinical encounters." (Opp'n to Bruckner MSJ [132] at 1.) Bruckner argues that Plaintiff has failed to produce any evidence that Bruckner "knew, recognized, or even reasonably should have reasonably known that the bump on his left thigh was a sarcoma." (Bruckner MSJ [107] at 6.) She also argues that her decision not to prescribe pain medication did not constitute deliberate indifference. (*Id.* at 9.) The court agrees with Bruckner on both counts.

Wesley maintains that Bruckner's subjective awareness of the severity of his medical condition is evidenced by notes in the medical record and by her deposition testimony. Specifically, he argues that Bruckner's notes revealed that the mass was growing over time, and that such growth should have alerted her to the severity of his medical condition. Wesley argues that these notes, and her testimony—that prior to her appointments with Wesley, she reviewed his medical history showing that the mass had been present, growing, and painful for several months—are evidence that Bruckner was aware of the severity of Wesley's medical condition. (Opp'n to Bruckner MSJ [132] at 4.) But the record further confirms that Bruckner subjectively believed Wesley's bump was a benign condition akin to what he had suffered from on previous occasions: she testified that she "thought [the bump] was more like a boil or cyst because [Wesley] thought it popped." (Bruckner Dep. [117-2] at 92:9-11.) Wesley's report that the bump "popped" is noted in Bruckner's medical note from the visit. (Bruckner SOF [109] ¶ 28; Stateville Medical Records [141] at 11.) Bruckner further observed in her testimony that boils and cysts could "grow or shrink" in size and could "resolve on their own." (Bruckner Dep. [117-2] at 98:7-9; 128:14-15.)

Note that this diagnosis, in the majority of cases like Wesley's, would not have been off the mark: Dr. Koniaris, Defendant's surgical oncology expert, opined in his report that sarcomas

are extremely rare: "Almost all patients who present with a soft tissue mass have common benign tumors, including lipomas, fibromas, schwannomas, cysts or potentially abscess[es]," and "[s]arcomas represent less than 0.1% of soft tissue masses." (Bruckner SOF [109] ¶¶ 58–59; Koniaris Rep. [115-6] at 8–9.) Wesley does not meaningfully dispute Dr. Koniaris's assessment. (Pl.'s Resp. to Bruckner SOF [131] ¶¶ 58–59.) While hindsight now reveals that Bruckner was mistaken in her diagnosis, but mistakes do not establish deliberate indifference. *Williams v. Patton*, 761 F. App'x 593, 597 (7th Cir. 2019) ("[A] mere disagreement with a medical professional's otherwise reasonable treatment is not a basis for a constitutional claim."); *McMorris v. Waterman*, No. 16-CV-1417-JPS, 2017 WL 4736737, at *1 (E.D. Wis. Oct. 20, 2017) (finding that treating nurse was not deliberately indifferent where "[t]he severity of [the prisoner's] condition was not so plain, or so mandating his preferred course of treatment, as to be obvious to any observer" and the nurse "made a considered judgment under the circumstances," because "Section 1983 is not an avenue for prisoners to second-guess the treatment decisions of prison medical staff.").

Nor does Bruckner's decision not to prescribe pain medication for Wesley constitute deliberate indifference. Of the three visits with Bruckner, the record shows that Wesley complained of some pain during only one of those visits: the November 23 visit where Wesley told Bruckner that he felt the bump "pop." Beyond Bruckner's observation during that visit that Wesley experienced "tenderness" when she touched the bump, Bruckner testified that there was "[no] other indication that he was in acute distress or acute pain." (Bruckner Dep. [117-2] at 132:18–23.) Her decision that pain medication was not warranted in these circumstances did not constitute "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011). Defendants' expert, Nurse Practitioner Sabas, opined that such a course of action—advising the patient not to put pressure on the nodule, and using pharmacologic alternatives like rest, ice, heat, or elevation, to assist with

the pain, without prescribing pain medication—met the standard of care (Bruckner SOF [109] ¶¶ 77–78), suggesting that Bruckner's actions do not rise to the level of negligence, let alone deliberate indifference. *Armstead v. Marandet*, No. 20-2891, 2021 WL 5492983, at *2 (7th Cir. Nov. 23, 2021) ("[T]he Eighth Amendment does not guarantee complete pain relief or recovery, just the absence of reckless care."). While Dr. Patel took issue with Dr. Sabas's characterization of the extent of Wesley's pain, he did not respond to Sabas's opinions regarding whether alternative pain management met the standard of care. (*See* Patel Rebuttal Rep. [116-10])

Bruckner is entitled to summary judgment.

**B. Truitt**

As a matter of first principles, "[b]ecause there is no vicarious liability under Section 1983, [Truitt] could be liable only if [he] personally did something that violated [Wesley's] rights." *Miller v. Harbaugh*, 698 F.3d 956, 960 (7th Cir. 2012). Wesley therefore cannot proceed with claims against Truitt based on a theory of *respondeat superior*. Instead, Wesley must demonstrate that a reasonable jury could find that Truitt had "sufficient personal responsibility," in that "he directed the conduct causing the constitutional violation, or [that the conduct] occurred with his knowledge or consent." *Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir. 2001) (citations omitted). To be liable, Truitt "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." *Id.* (quoting *Chavez v. Ill. State Police*, 251 F.3d 612, 651 (7th Cir.2001)).

Wesley advances two theories regarding Truitt's personal involvement in his medical treatment: (1) that Truitt knew of Wesley's "condition and unsuccessful attempts to obtain treatment" based on letters Wesley sent to Truitt; and (2) that Truitt knew of and failed to correct "systemic deficiencies" at Stateville. (Opp'n to Truitt MSJ [135] at 5, 7.) Wesley contends that Truitt's failure to respond despite this knowledge constitutes deliberate indifference. Truitt argues that his conduct was not sufficiently culpable, that Wesley failed to demonstrate Truitt's alleged inaction caused him injury, and that he is entitled to qualified immunity.

### 1. The Letters

Truitt claims that he lacked subjective awareness of Wesley's complained-of delays. But Wesley testified that he wrote the letters to Truitt, that he addressed them to Truitt, and that he saw guards collect his letters for delivery. "Placing the [letters] in the prison mail system supports an inference of receipt." *Horshaw v. Casper*, 910 F.3d 1027, 1029 (7th Cir. 2018). There is, thus, a genuine dispute as to whether Truitt received these letters from Wesley. The question then is whether the dispute is material: i.e., whether the contents of the letters, taken together, were sufficient to alert Truitt to a serious risk of harm.

In the letters, Wesley complains to Truitt about the knot on his left leg that was growing and painful to the touch, and medical providers' failure to follow up with him regarding the knot. Truitt argues the letters, if he had received them, did not alert him to the possibility of a specific harm—a concern that this knot was cancerous—nor did they request a specific remedy, therefore rendering them insufficient to establish Truitt's subjective awareness for the purposes of deliberate indifference. (Truitt MSJ [120] at 7.) But a prisoner alerting a prison official of the possibility of harm may satisfy the deliberate indifference standard without identifying the specific harm that may result. *See Horshaw*, 910 F.3d at 1029 (7th Cir. 2018) ("Prisoners do not need 'advance knowledge of every detail of a future assault' to show that they faced a serious risk." (quoting *Weiss v. Cooley*, 230 F.3d 1027, 1032 (7th Cir. 2000)). Wesley did not need to inform Truitt of the risk that the bump might be cancerous in order for Truitt to understand the possibility that Wesley would face serious harm if the bump remained unexamined.

Truitt's remaining argument carries more weight: there is no basis for a showing that his failure to respond to Wesley's letter was the cause of his injury. Wesley's letter simply requested that Truitt "look into this matter" for him. (PSOF on Truitt MSJ [136] ¶¶ 18, 21; [124] at 176, 178.) Truitt testified that, had he received the letter, its contents would have prompted him to follow up with the HCUA or the Director of Nursing (Truitt Dep. [118-9] at 96:7–13), but there is no basis for a finding that this follow-up would have prompted these administrators to schedule him with a

primary care provider rather than simply directing him to follow the sick call process. Note that Wesley *was* seen by medical and nursing staff quite soon after the September letter: by Nurse Domercant on October 15, 2022; by Nurse Practitioner Orr on October 25; by Dr. Henze (who made the ultrasound referral) on October 25; by Nurse Practitioner Bruckner on November 4; by Nurse Mitchell McGladdery on November 22; by Bruckner again on November 23; by an unknown provider on November 28; by Bruckner once again on December 1; and finally by another unnamed person on December 18. Truitt was entitled to rely on the judgment of these medical and nursing professionals, who were not ignoring Wesley but who themselves did not recognize Wesley's mass for the rare condition it was. Wesley's assertion that it was Truitt's inaction in response to his letters that caused his delay in medical treatment is simply conjecture, and insufficient to survive summary judgment. *Barnes v. Wexford Health Sources, Inc.*, 177 F.4th 825, 831 (7th Cir. 2026) ("Inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." (cleaned up)).

**2. Systemic Deficiencies**

Wesley also contends that Truitt's deliberate indifference is demonstrated by his awareness of systemic deficiencies at Stateville and his failure to do anything in response. This theory bears only brief discussion: Wesley has failed to produce evidence in the record sufficient for a reasonable jury to find that Truitt was aware of systemic deficiencies in Stateville's health care services. Regarding Truitt's awareness of possible staffing shortages in the health care unit, Wesley points only to Truitt's testimony regarding *general* staffing shortages at Stateville. (PSOF [136] ¶ 27.) When Truitt was asked specifically about staffing shortages in the health care unit, he stated that he did not recall negative findings with respect to health care services at Stateville, and that he had no "personal knowledge as to specific shortages in the health care." (Truitt Dep. [124] at 118, 152:14–17; Truitt Resp. to PSOF [153] ¶ 27.) While Truitt did testify that he was aware that the HCUA position was "vacant for quite a lengthy period of time" in and around 2022, (PSOF on Truitt MSJ [136] ¶ 28; Truitt Dep [124] at 95, 60:8–14), there is no evidence showing

how this vacancy caused or contributed to Wesley's complained-of delay. In light of these gaps in the record, no reasonable jury could find that the alleged staffing shortages in the health care unit existed, let alone that Truitt was aware of and deliberately indifferent to such shortages.

Truitt's motion for summary judgment is granted.

## III. Wexford

That leaves Wesley's claim that Wexford is liable for the delays in treatment. As is well recognized, municipalities, or corporations like Wexford who act under the color of state law, cannot be held vicariously liable for Eighth Amendment violations. *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690–91 (1978). Consequently, to bring a deliberate indifference claim against Wexford, Wesley must prove that a Wexford policy or custom caused his constitutional deprivation. *Feazell v. Wexford Health Sources, Inc.*, 140 F.4th 438, 442–43 (7th Cir. 2025) (citing *Monell*, 436 U.S. at 690–91). There are at least three types of municipal action that may give rise to municipal liability under § 1983:

> (1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority.

*Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021).

Wesley does not argue that a person with final policymaking authority caused his injury, nor does he raise any facial challenge to an express Wexford policy. Consequently, he must show that the constitutional violation was caused by Wexford's "custom or practice." *Id.* This custom or practice must be "the moving force" behind the constitutional violation, and Wesley must show "a direct causal link between the challenged municipal action and the violation of [Wesley's] constitutional rights." *Feazell*, 140 F.4th at 443 (citation and internal quotation marks omitted). Importantly, Wesley must also show deliberate indifference on Wexford's part. The Seventh Circuit has held that when a plaintiff challenges a practice or custom, rather than a facially unconstitutional policy, "*considerably more proof than the single incident will*

*be necessary in every case* to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation." *Dean*,18 F.4th at 236 (quoting *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 824 (1985)). The Supreme Court discussed the rationale behind this requirement in *Board of County Commissioners of Bryan County v. Brown*, 520 U.S. 397, 407 (1997): "[A] prior pattern of similar violations puts the municipality on notice of the unconstitutional consequences of its policy, such that its 'continued adherence' to the policy might 'establish the conscious disregard for the consequences of [its] action—the 'deliberate indifference'—necessary to trigger municipal liability.'" *Dean*, 18 F.4th at 236 (quoting *Brown*, 520 U.S. at 407).

To make out his claim, Wesley must therefore demonstrate that the "practice was 'so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision.'" *Hildreth v. Butler*, 960 F.3d 420, 426 (7th Cir. 2020) (quoting *Phelan v. Cook County*, 463 F.3d 773, 789, 790 (7th Cir. 2006), *overruled on other grounds by Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016)). "This requires 'more than a showing of one or two missteps.'" *Id.* "There must be 'systemic and gross deficiencies.'" *Id.* Wesley makes no such showing. He does not offer evidence suggesting that Wexford, assuming it is responsible for implementing AD 04.03.103, regularly scheduled primary care evaluations, upon a referral, far into the future. Indeed, Wesley does not offer any evidence regarding Wexford's practices beyond his own experience. "While it is not impossible for a plaintiff to demonstrate a widespread practice or custom with evidence limited to personal experience, it is necessarily more difficult . . . because what is needed is evidence that there is a true municipal policy at issue, not a random event." *Id.* at 426 (internal quotation marks and citation omitted). Proof of such a custom may be made out when the conduct at issue happens sufficiently often in the course of one inmate's treatment—a "handful of incidents of misconduct" is insufficient. *Doe v. Vigo County.*, 905 F.3d 1038, 1045 (7th Cir. 2018) (a "handful of incidents of misconduct," including several incidents of sexual contact, two incidents of inappropriate comments, and two allegations of harassment over two

decades "is not enough to establish a custom or practice"); *see, e.g.*, *Estate of Moreland v. Dieter*, 395 F.3d 747, 760 (7th Cir. 2005) (three incidents of improper pepper-spraying over a three-year period did not amount to a widespread custom); *Gable v. City of Chicago*, 296 F.3d 531, 538 (7th Cir. 2002) (three incidents of erroneously denying to vehicle owners that their vehicles were in the impoundment lot over a four-year period did not amount to a persistent and widespread practice). Wesley was referred for a primary care evaluation during two visits prior to his ultrasound: once on August 25 and once on September 5. He did not see a primary care provider until October 25, 2022. These two instances of delay are troublesome, but they do not establish that Wexford is guilty of systematically delayed such evaluations. *Grieveson v. Anderson*, 538 F.3d 763, 774-775 (7th Cir. 2008) (holding that four instances of possible misconduct over the course of eleven months was "simply . . . not enough to foster a genuine issue of material fact that the practice was widespread").

Anyone in need of medical care desires prompt, responsive treatment. Wesley's treatment was delayed, in part because medical providers did not initially recognize the significance of the lump on Wesley's thigh. But because he did not establish a genuine issue of material fact regarding the existence of an unconstitutional Wexford policy or practice of delay, the court grants summary judgment for Wexford.

## CONCLUSION

Medical providers failed to recognize that the lump on Plaintiff Wesley's left thigh was a rare instance of sarcoma. As a result, his condition worsened and appropriate treatment was delayed. But the evidence does not show that Defendants Henze, Orr, Bruckner, or Wexford were deliberately indifferent to Wesley's serious medical condition. Assuming that Defendant Truitt received Wesley's letters and failed to follow up, Wesley received medical care in the weeks following those letters, and there is no basis for the conclusion that a call from Warden Truitt would have changed medical staff's assessment. The motions for summary judgment [99, 104, 106, 110, 119] are granted.

ENTER:

Dated: September 15, 2026

REBECCA R. PALLMEYER
United States District Judge